PEOPLE v BECKLEY

PEOPLE v BADOUR

Docket Nos. 81583, 82892. Argued June 8, 1989 (Calendar Nos. 12-13). Decided June 5, 1990. Rehearing denied in *Badour,* 435 Mich 1243.

Robert L. Beckley was convicted by a jury in the Muskegon Circuit Court, R. Max Daniels, J., of first-degree criminal sexual conduct involving his fifteen-year-old daughter. The Court of Appeals, Hood, P.J., and Beasley and L. Townsend, JJ., affirmed in an opinion per curiam, holding that the trial court did not abuse its discretion in admitting the expert testimony of a rape counselor for the narrow purpose of rebutting an inference that the complainant's behavior following the alleged incident was inconsistent with that of an actual victim of sexual abuse, incest, or rape (Docket No. 82153).

Carol Badour was convicted by a jury in the Bay Circuit Court, William J. Caprathe, J., of aiding and abetting first-degree criminal sexual assault involving her six-year-old daughter. The Court of Appeals, MacKenzie, P.J., and Doctoroff and P. J. Clulo, JJ., affirmed in an opinion per curiam, holding that the trial court did not abuse its discretion in admitting testimony of an expert because the witness did not testify regarding "rape trauma syndrome," but rather merely offered testimony regarding a child's behavior following an alleged incident of sexual abuse (Docket No. 94184).

The defendants appeal, attacking in each case the admissibility of the expert testimony.

The Supreme Court *held:*

1. In a case involving the sexual abuse of a child, an expert may testify, under certain circumstances, that the particular behavior of the child was characteristic of child sexual abuse victims generally.

2. An expert may not testify with regard to whether the complainant's allegations are truthful, i.e., whether abuse in fact occurred.

3. Child sexual abuse accommodation syndrome evidence is unreliable as an indicator of abuse.

4. The evidentiary test, which would restrict the admissibil-

ity of relevant evidence that is based on a novel scientific principle or technique unless its proponent is able to show that the principle or technique has gained general acceptance within the relevant scientific community, is not applicable to expert witnesses in the behavioral sciences.

5. The decision in *Beckley* is affirmed; the decision in *Badour* is reversed, and the case is remanded for a new trial.

Justice BRICKLEY, joined by Justices LEVIN and GRIFFIN, stated:

Expert testimony regarding behavior patterns of sexually abused children is admissible only for the narrow purpose of rebutting an inference that a complainant's behavior following an incident was inconsistent with the behavior patterns of actual victims of sexual abuse, generally. Experts may testify so long as there is no reference to a fixed set of behavior constituting a syndrome. Because syndrome evidence is not a technique or principle which can predict abuse, and is used merely to explain behavior, the test to determine whether it is a technique generally recognized within the scientific community is inapplicable.

Child sexual abuse accommodation syndrome evidence essentially is a therapeutic tool. It serves only to define the broad range of possible physical, psychological, and emotional reactions that a child victim could experience. It was intended to be a common language for professionals working with sexually abused children, and not a diagnostic tool for detection of sexual abuse. It has no probative value for detecting sexual abuse on the basis of the existence of certain behavioral characteristics. Because experts agree generally that there is no specific set of characteristics that can be attributed to every person in diagnosing child sexual abuse, and because testimony as to the existence of the syndrome in a particular case must assume the presence of abuse, admission of evidence of the existence of the syndrome can be prejudicial to a defendant.

Evidence of the syndrome is not a conclusive finding of abuse. What the expert and the practitioner must look for in a given case are certain behavior patterns of the victim that are representative of sexually abused children as a class. Evidence of such patterns has very limited use, i.e., to provide a background for an evaluation of a particular child's behavior, and thus should be admitted cautiously because of the danger of permitting the inference that as a result of the existence of certain behavioral patterns in the alleged victim, sexual abuse in fact occurred, when evidence of the syndrome is not a

conclusive finding of abuse. Although syndrome evidence may be appropriate as a tool for purposes of treatment, it is unreliable as an indicator of abuse. Its admissibility thus must be limited to a description of the uniqueness of a specific behavior brought out at trial. While, generally, effective cross-examination will prevent the jury from drawing an inference that abuse occurred, a limiting instruction may be necessary and should be given on request.

The purpose of allowing expert testimony in cases of child sexual abuse is to give the jury a framework of possible alternatives for the behavior of the victim at issue in relation to abuse victims as a class. In this respect, the expert's role is to provide sufficient background information about the individual behavior at issue which will help the jury to dispel any popular misconception commonly associated with the demonstrated reaction. The expert's evaluation of the individual behavior traits at issue is not centered on what was observed in the particular victim, but rather whether the behavioral sciences recognize such behavior as being a common reaction to a unique criminal act.

Because a witness qualifies as an expert because of knowledge and experience in dealing with others who have been abused, and not on the basis of an examination of the particular victim, the expert's testimony should be confined to an explanation of the behavior traits at issue, as defined by the science that forms the basis of the expertise. A party is not precluded from questioning an expert regarding familiarity or understanding of the behavior of the victim at issue, and the expert may define the victim's behavior in terms of a factual background that may be related to those aspects of the behavior which become evidence. However, the expert may not introduce new facts based on personal observation of the complainant unless otherwise admissible. Accordingly, expert testimony should be limited to providing the jury with background information relevant to the specific aspect of the conduct at issue which the jury otherwise could not bring to an evaluation of the child's credibility. To permit expert witnesses to render legal conclusions regarding whether abuse in fact occurred exceeds the scope of the rule. The jury must make its own determination from the totality of the evidence.

Given the abhorrence of the crime, it is inevitable that persons who treat child victims will have an emotional inclination toward protecting them and may lose some objectivity in a particular case. To avoid this, the trial court should carefully scrutinize the treating professional's ability to aid the trier of

fact when exercising discretion in qualifying such expert witnesses.

In *Beckley,* although the expert testimony exceeded the scope of the trial court's limitation, no objection was raised with regard to the limitation, and it nevertheless was objective and advisory. An opinion offered by the expert on cross-examination with regard to the child victim, which would have been inappropriate on direct examination, was brought out by the defendant and does not require reversal.

In *Badour,* the trial court permitted expert testimony beyond that necessary to help the jury understand the victim's behavior. The testimony was not limited to background information, and the expert's role was heightened from that of advisor to one of advocate, permitting the expert to vouch for the complainant's credibility and leaving the jury with the impression that the victim had been abused.

Justice BOYLE, joined by Chief Justice RILEY, concurred to the extent that the test of *People v Davis,* 343 Mich 348 (1955), and *Frye v United States,* 54 App DC 46 (1923), which would limit the use of evidence supplied by novel scientific principles or techniques, is inapplicable to the expert's testimony; that syndrome evidence is not admissible to prove that sexual abuse occurred; that an expert may not testify that a child is telling the truth; and that an expert may testify that the behavior of the complainant is consistent with that of children who report sexual abuse.

In child sexual abuse cases where aspects of a child's behavior create credibility issues about which a qualified expert is prepared to testify, the expert's testimony should be admitted where the trial court determines that it will aid the trier of fact—as long as the expert does not render an opinion that sexual abuse occurred or vouch for the credibility of the child witness.

An expert should not be permitted to testify that the child was abused, or to render an opinion that the defendant was the abuser, but should be permitted to compare the behavior of the complainant with that exhibited by sexually abused children and to offer an opinion regarding whether the complainant's behavior is consistent, if such an opinion will assist the jury. The ultimate determination of whether abuse occurred is for the jury.

In *Badour,* reversal is required because the defendant objected to the testimony on the ground that it was offered to show that the child had been abused and the testimony revealed that the prosecutor's purpose in offering it simply was to

show that the child had been abused and that the defendant had participated in the abuse. In view of the halting and incomplete testimony of the victim and the fact that the expert testimony was directed not only to whether abuse had occurred but to the defendant's participation in the abuse, it cannot be concluded that the trial did not constitute a miscarriage of justice.

In *Beckley,* by contrast, the helpfulness of the expert's testimony in evaluating credibility became apparent in the pretrial motion and the defendant's opening statement. The complainant's seemingly unusual behavior was revealed on direct examination and was the subject of cross-examination. The expert's conclusion that the complainant's behavior was consistent with that of a victim of sexual abuse was properly admitted to assist the finder of fact in determining the victim's credibility, and the expert's testimony on redirect examination regarding "victim symptoms" was relevant and proper as responsive to the defendant's cross-examination. In addition, a proper instruction was given, limiting consideration of the expert's testimony to the issue of credibility.

Justice ARCHER, joined by Justice CAVANAGH, concurring in part and dissenting in part, while agreeing with the result reached by the lead opinion in *Badour,* stated that an expert witness testifying on the basis of child sexual abuse accommodation syndrome evidence should be precluded from making any reference to the particular complainant or specific facts before the court because the danger is too great that the trier of fact will improperly infer that the expert testifying on the basis of syndrome evidence is, in effect, concluding that the particular complainant before the court has been abused.

The child sexual abuse accommodation syndrome is a therapeutic tool which assumes abuse. The relevant scientific community does not rely upon syndrome evidence to prove that abuse in fact has occurred. The inherent danger in failing to narrowly circumscribe an expert's testimony to the general class of child abuse victims is that syndrome evidence can all too easily be misconstrued as constituting a method of proving or predicting child abuse. The ultimate purpose of child sexual abuse accommodation syndrome evidence is to dispel the myths and misconceptions surrounding sexual assault crimes. Once an expert witness presents evidence disabusing the specific misconception at hand, such as delayed disclosure, syndrome evidence has served its proper function. This function can be accomplished just as effectively without reference to the complainant before the court. When an expert is permitted to refer to the

particular complainant and the facts of the case, a criminal defendant faces substantial prejudice that no curative instruction can undo.

In *Beckley,* the error requiring reversal occurred during the prosecution's direct examination of an expert witness. Aside from the obvious prejudice deriving from the prosecution's repeated references to the complainant as a victim, the jury reasonably could have inferred that the expert, who testified that she had personally examined the complainant for purposes of diagnosis and treatment, was at the very least agreeing that the complainant in fact had been sexually abused.

*Beckley,* affirmed.

*Badour,* reversed and remanded for a new trial.

161 Mich App 120; 409 NW2d 759 (1987) affirmed.

167 Mich App 186; 421 NW2d 624 (1988) reversed.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Tony Tague,* Prosecuting Attorney, *Judith K. Simonson,* Senior Assistant Prosecuting Attorney, and *Kevin Lynch,* Assistant Prosecuting Attorney, for the people in *Beckley.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *George B. Mullison,* Prosecuting Attorney, and *Martha G. Mettee,* Assistant Prosecuting Attorney, for the people in *Badour.*

State Appellate Defender (by *Richard B. Ginsberg* and *Jack Van Coevering*) for defendant *Beckley.*

State Appellate Defender (by *Richard B. Ginsberg*) for defendant *Badour.*

Amici Curiae:

*Carole M. Stanyar* and *Kenneth M. Mogill* for Criminal Defense Attorneys of Michigan, National Legal Aid and Defender Association, and Michigan Inter-Professional Association.

*Robert Cares* for Prosecuting Attorneys Association of Michigan.

BRICKLEY, J. In these two cases, consolidated on appeal, each defendant was convicted by a jury of first-degree criminal sexual conduct.[1] During each trial, an expert testified regarding the characteristics and patterns of behavior typically exhibited by sexually abused children. We granted leave to appeal to determine whether the trial court properly admitted the disputed expert testimony.[2]

I

### A. PEOPLE v BECKLEY

Defendant, Robert Lee Beckley, was convicted of first-degree criminal sexual conduct for having sexual intercourse with his fifteen-year-old daughter. At the time of the incident, the victim had been living with her father; her parents were divorced.

She testified that on the evening of May 29, 1983, her father returned home, under the influence of alcohol,[3] and, while watching television, defendant began rubbing her back. Thereafter he gave her several "French kiss[es]." A short time later, defendant called his daughter into his bedroom and requested that she "lay down with him for a while." The victim was pulled onto the bed, at which time defendant removed her clothing while holding her arm and had vaginal intercourse with her. Following the incident, defendant made her promise not to tell anyone.

According to the victim, the incident lasted

---

[1] MCL 750.520b; MSA 28.788(2).

[2] *People v Beckley,* 430 Mich 858 (1988); *People v Badour,* 432 Mich 851 (1989).

[3] Defendant admits having a drinking problem.

about ten minutes after which she got out of bed, picked up her clothing and went to the bathroom where she washed and dressed. She made two phone calls to her mother relaying that her father had made passes at her, but withholding information as to the intercourse. During the first phone call, the victim refused her mother's request to pick her up. Yet, immediately thereafter she called her mother again and asked to be picked up. She was waiting outside when her mother arrived and they went to her paternal grandmother's home. The mother and grandmother discussed defendant's advances without mention of the intercourse.[4]

A few days later, the victim, accompanied by her grandmother, made a trip to defendant's home so that she could pick up her belongings. On the trip, Wilda Beckley, testified that the victim said, " 'By the way, Grandma, that mess the other night, . . . I made a mountain out of a molehill. . . . My dad didn't do anything to me.' " The victim denied making such a statement.

The act of intercourse was not revealed until approximately one year later when the victim wrote about the incident in a journal for a high school English assignment. According to the victim, during the interim year she had told some of her friends about the passes, but had continued to deny that any intercourse had taken place. Apparently, the only person she told about the entire incident was her boyfriend. Further during the one-year time period between the incident and disclosure, she continued to see her father on various occasions. However, the victim and her father were never alone together.

---

[4] The victim testified that she was crying and very upset; however, her grandmother stated that she was not crying and was her "usual self."

Defendant affirmatively denies having sexual intercourse with his daughter. However, he admits that he "French" kissed her and that he called her to join him in bed. However, as he explained to his daughter, the incident was merely a game to see if his daughter was sexually active. Thus, defendant's version of the facts was substantially the same as the victim's up until the time of the journal entry which disclosed sexual intercourse.

The victim was the first witness called by the prosecution to testify. On cross-examination, the defense tried to discredit the victim's allegations by suggesting that the complainant's behavior was inconsistent with a person who had been victimized. Four specific items of behavior of the complainant were brought out on cross-examination: (1) the delayed disclosure, (2) the medium of disclosure, (3) the complainant's continued desire to see the alleged offender, and, (4) the victim's initial tendency to deny sexual intercourse.

Following testimony by the victim, the prosecution sought permission to call Robin Smietanka as an expert witness.[5] The trial court qualified Ms. Smietanka as an expert pursuant to *People v Stull,* 127 Mich App 14; 338 NW2d 403 (1983).[6] However, the court limited the testimony to the victim's behavior observed by the expert which would be consistent with the profile of an incest victim. The court specifically stated that it would disallow any testimony concerning the complainant's credibility and whether or not any sexual assault had actually taken place. Further the

[5] Prior to trial, the prosecution filed a motion to endorse Smietanka as an expert witness. The testimony given at the pretrial hearing was substantially the same as that given at trial.

[6] In *Stull,* a rape counselor was allowed to testify on the basis of her training and observations of the complainant as to whether or not her behavior was consistent with the profile of a rape victim. 127 Mich App 19.

court allowed the prosecution to present the expert testimony in its case in chief because "it . . . appear[ed] that defendant would raise these issues by attack on the credibility of the complainant . . . ."

Ms. Smietanka testified that the bulk of psychiatric literature suggests that victims of sexual abuse exhibit certain patterns of behavior that are indicators of the abuse. Specifically, she commented on the four instances of behavior observed in the complainant.[7] On direct examination, Ms. Smietanka testified that the delayed disclosure, disclosure to a third party outside the family, continual contact with the offender, and initial reporting of only "passes" are all typical behavioral characteristics of a victim of sexual abuse.

On cross-examination the defense also centered its questioning on the victim's lack of memory about conversations with persons concerning the incident. Ms. Smietanka testified that such inconsistencies were not necessarily indicative of a lie, but of an attempt on the part of the victim to minimize the event. Thus they were not inconsistent with behavioral patterns of sexually abused persons.

Defense counsel drew out the fact that the complainant's parents had gone through a bitter divorce, that the complainant's mother was very vindictive, and that within days preceding the journal entry defendant had hurt complainant's feelings. Ms. Smietanka testified that these factors would be significant; however, "[t]he additional factors that you have asked about would certainly need to be explored, but just based on what you said, it would not rule out a sexual abuse."

---

[7] In June, 1984, the victim was referred to Ms. Smietanka for diagnosis and treatment by the Muskegon County Department of Social Services. Ms. Smietanka counseled her on three occasions.

On redirect examination, the prosecutor tried to draw out those indicators that the expert thought would support a finding of sexual abuse. The expert responded that the following behavioral patterns would also be indicators of abuse: (1) the child's ability to recount any pattern of activity which would demonstrate that the incident was not an isolated event; (2) a progression of actual sexual activity; (3) a tendency towards secrecy; (4) exertion of pressure or coercion, i.e., threats as a result of the victim disclosing or attempting to disclose the event; and (5) the child's ability to give explicit details of the sexual activity. Thus, the examination of this witness was no longer limited to the four specific behavioral characteristics originally attacked by defendant on cross-examination of the victim.

On recross-examination the defense again tried to emphasize that the symptoms exhibited could be from another source. For example, whether or not school trouble could be the result of some other problem in the child's life. Ms. Smietanka testified that it would be less likely to see school trouble as a symptom of sexual abuse. However, she did suggest that many of the same symptoms seen in a child of sexual abuse could be seen when the parents are divorcing.

Following the testimony, the defendant moved for a mistrial or to strike the testimony. The ground upon which the defense relied was that the witness' testimony enhanced the credibility of the witness to the extent that she supported what the complainant was relating about the ultimate question in the case. The trial judge denied defendant's motion on the ground that the scope of the witness' testimony was widened by defense counsel rather than by the prosecution.

### B. PEOPLE v BADOUR

Defendant's conviction arises out of an incident involving her six-year-old daughter. Defendant was convicted of first-degree criminal sexual conduct on an aiding and abetting theory and sentenced to thirty to sixty years.

The victim accused her mother of holding down her arms and legs and forcing her to perform fellatio on defendant's live-in boyfriend, Roy Erving. The incident came to the attention of the authorities when the victim was locked out of her home during January, 1985. It was at this time that she was placed in foster care. Initially, only Roy Erving was accused and it was not until June, 1985, that the victim raised allegations against her mother. This occurred when the victim began counseling at Lutheran Child and Family Services, during a group session called "Daughters United."[8] Thereafter, the psychologist to whom the victim made the allegations contacted a counselor at the Department of Social Services.

The defendant has generally denied the allegations raised against her. In November, 1984, she moved out of the house that she and Roy shared for six years. Thereafter, defendant had ceased to have any type of relationship with Roy and argued that therefore there would be no reason for her to allow him to perform sexual acts on her daughter.

The prosecution's first witness was Lynn Butterfield, a psychologist employed by Lutheran Child and Family Services. The trial court certified Ms. Butterfield as an expert over defendant's objection.

[8] "Daughters United is a group for child victims of sexual abuse." Daughters United facilitates a "group atmosphere, talking about what happened to them, their feelings about it, the girls are in . . . different phases of dealing with a child sexual abuse problem; and that helps—the group work helps the individuals to make progress, as well as seeing them individually also."

On direct examination, Ms. Butterfield gave testimony relating to sexually abused children generally, as well as an opinion relating specifically to observable behavior of the complainant.[9]

On cross-examination defense counsel tried to elicit testimony that would suggest that the "symptoms" that the victim was experiencing were the direct result of being placed in foster care. Further, that she was lying in an attempt to get back at her mother and Roy for breaking up. In response, Ms. Butterfield testified that placing a child into a new setting could produce feelings of fear, lack of trust, and anxiety. As to the question about whether or not the victim was lying, Ms. Butterfield stated that such a conclusion could not be eliminated.

On redirect examination the prosecutor brought out testimony as to whether or not children had the ability to invent sexual acts. In response Ms. Butterfield testified generally that children basically have no knowledge of sexual acts and therefore there is no way a child could invent a specific sexual act without experiencing it. However, she qualified the answer, stating that much of what a child knows or is able to relate concerning sexual acts depends on the child.

The prosecution called a second expert, Dr. Shinedling, over defendant's objection.[10] The trial court limited Dr. Shinedling's testimony to the behavior patterns of children who were sexually abused. However, the court prohibited "syndrome type"[11] testimony and any expert opinion as to

---

[9] Testimony about specific behavior exhibited by the victim was also received from Regina Woods, the complainant's foster mother.

[10] Although objected to at trial, the propriety of Dr. Shinedling's testimony is not at issue on appeal.

[11] "Syndrome type" testimony is behavioral characteristics collectively associated with the syndrome which would suggest that the

whether or not the victim had been sexually assaulted. Dr. Shinedling testified as to the type of test that he generally gives children to determine their developmental level. Dr. Shinedling also testified as to what expectations a person could have when dealing with a child and their precision as to dates and sequences of events. Specifically Dr. Shinedling stated that children are very imprecise and have a hard time conceptualizing days, weeks, or months.

Consistent with Ms. Butterfield's testimony, Dr. Shinedling testified that a child who had not experienced a sexual act typically could not fabricate the story. He qualified the statement by suggesting that the ability to fabricate would depend on the age of the child. However, sexually inexperienced children would tend to view a sexual act as something other than what it actually was. Concerning a sexually abused child's disclosure patterns, he stated that it was rare for a sexually abused child to volunteer any information.

Thereafter, Dr. Shinedling testified regarding the tests he had specifically given the victim. The only conclusion that Dr. Shinedling drew, in terms of an opinion, were about the victim's intelligence level. He suggested that the victim was borderline dull to normal range of intelligence.

II

The Court of Appeals upheld the admissibility of the expert testimony in both cases.[12] In *Beckley,* the Court held:

A rape counselor's testimony is admissible, un-

---

victim was diagnosed as possessing the syndrome. The net result of syndrome type testimony is an opinion that abuse in fact occurred.

[12] *People v Beckley,* 161 Mich App 120; 409 NW2d 759 (1987); *People v Badour,* 167 Mich App 186; 421 NW2d 624 (1988).

der established precedent, for the narrow purpose of rebutting an inference that a complainant's postincident behavior was inconsistent with that of an actual victim of sexual abuse, incest or rape. A cautionary instruction must be given to the jury. The evidence herein fits squarely into these categories. [161 Mich App 120, 129; 409 NW2d 759 (1987).]

The *Badour* panel ruled that the trial court did not abuse its discretion because Ms. Butterfield did not testify regarding "rape trauma syndrome." Rather, she testified merely regarding a child's behavior following an alleged incident of sexual abuse. 167 Mich App 186, 196; 421 NW2d 624 (1988).

The common arguments in each case, raised by defendants in this Court, attack the admissibility of the expert testimony on the following grounds: (1) the testimony is unreliable because it fails to meet the *Davis/Frye*[13] test; (2) the testimony of each expert amounted to an opinion as to the truthfulness and credibility of the complaining witness; and (3) the testimony was unfairly prejudicial. The prosecution has responded, arguing first that the *Davis/Frye* test is inapplicable because the expert testimony in each case did not involve techniques, instruments, or a specific scientific method of a technical nature. Further, the evidence was properly admitted pursuant to MRE 702 governing admission of expert testimony. Defendant in *Badour* raises two additional arguments: (1) that the expert was not qualified to give an opinion on the basis of the " 'indicia' of a sexually abused child," and (2) that the expert testimony concerning the complainant's identification of de-

---

[13] *People v Davis*, 343 Mich 348; 72 NW2d 269 (1955); *Frye v United States*, 54 App DC 46; 293 F 1013 (1923).

fendant was inadmissible hearsay.[14] Conversely, the prosecutor in *Badour* argued that the trial court did not abuse its discretion because the particular witness had sufficient training and education to be treated as an expert for purposes of rendering an opinion in this case. The prosecutor asserts in response to defendant's hearsay argument that the evidence was not offered for the truth of the allegations, but to show why the child was originally undergoing counseling.

### III

Because "syndrome"[15] evidence as it relates to child abuse cases is a relatively new development in the law and novel to our Court, we begin our analysis with an examination of the law of other jurisdictions. The division among the courts of the nation as to the admissibility of "syndrome" evidence in child abuse cases has spawned various

[14] Because of the resolution of the other issues raised, we find it unnecessary to address this issue.

[15] The "syndrome" theory in these cases is most commonly labeled "child sexual abuse accommodation syndrome." Other documented syndromes include: battered child syndrome, battered wife syndrome, battering parent syndrome, separation trauma and rape trauma syndrome. See, generally, Cohen, *The unreliability of expert testimony on the typical characteristics of sexual abuse victims,* 74 Georgetown L J 429, 448-451, citing *State v Danielski,* 350 NW2d 395 (Minn App, 1984).

The American Psychiatric Association (APA) does not recognize child sexual abuse accommodation syndrome as a mental disorder. Rather the Diagnostic & Statistical Manual of Mental Disorders (3d rev ed) (DSM-III) defines "syndrome" generally. The DSM-III is the APA's official manual of recognized mental disorders. "Syndrome" is defined as "a group of symptoms that occur together and that constitute a recognizable condition." The term " '[s]yndrome' is less specific than 'disorder' or 'disease.' The term 'disease generally implies a specific etiology or pathophysiological process." DSM-III, Appendix C, p 405.

Although the DSM-III does not specifically define child sexual abuse accommodation syndrome, it does explain and recognize posttraumatic stress disorder. Some experts rely on this disorder as a framework for diagnosing and treating persons manifesting sexual abuse syndrome.

theories of admissibility ranging from admission of syndrome evidence generally, including an opinion on the specific behaviors of the child victim, to admission of testimony only as to a specific behavior associated with the syndrome. Because syndrome evidence is not necessarily probative of abuse,[16] the trend among the various jurisdictions is to admit the evidence of behavioral patterns of sexually abused children only as rebuttal or rehabilitative evidence. Even the most liberal of the theories for admitting the evidence does not allow admission as substantive evidence.[17]

*State v Kim,* 64 Hawaii 598; 645 P2d 1330 (1982), has adopted the most liberal approach to admissibility. In *Kim,* the defendant was convicted of second-degree rape of his thirteen-year-old stepdaughter. After informing her mother, the complainant was taken for a medical examination. The examiner was Dr. Mann, a pediatrician and child psychiatrist. At trial, the defense attempted to impeach the complainant's credibility. There-

---

[16] A syndrome, however, is not considered a diagnosis by the medical community; rather, it is a collection of related symptoms. Whether the pattern of symptoms can constitute a diagnosis is determined in part by whether a common underlying pathological process can be identified as the causal agent of the pattern of symptoms. Further, the underlying pathological process must be recognized as a disorder within a standard diagnostic manual. The symptom pattern is not assigned the label of a diagnosis, but rather, the symptom pattern is evidence of the underlying pathological process to which it is causally connected. For these reasons, it is not medically proper to diagnose the existence of a syndrome. [Lorenzen, *The admissibility of expert psychological testimony in cases involving the sexual misuse of a child,* 42 U Miami L R 1033, 1046-1048 (1988).]

[17] We note that there is an admissible per se approach which is most readily identified with adult cases where "rape trauma syndrome" evidence is admitted to show lack of consent. However, this theory has not been applied to child sexual abuse cases. See, e.g., *State v Huey,* 145 Ariz 59; 699 P2d 1290 (1985), *State v Marks,* 231 Kan 645; 647 P2d 1292 (1982), *State v Allewalt,* 308 Md 89; 517 A2d 741 (1986), and *State v Liddel,* 211 Mont 180; 685 P2d 918 (1984).

after the trial court ruled that the defendant had placed the complainant's credibility at issue and therefore expert testimony was admissible for rebuttal.[18] Dr. Mann was allowed to testify concerning evidence of the syndrome generally.

On appeal, after announcing the general rule that the jury is the sole judge of credibility, the court ruled that any danger that the jury would surrender its function is diminished if the testimony remains consistent with its specific purpose. The *Kim* court allowed Dr. Mann to testify with respect to this particular complainant. In fact, he opined that he found the victim's account "believable." *Id.* at 601.

Further, the *Kim* court specifically required that all information on which the syndrome was premised must be submitted to the jury for its assessment. It reasoned that such information was necessary to "enable the jury to evaluate the mode as well as conclusions of the expert . . . ." *Id.* at 606.

The court in *Kim* recognized that there were dangers in allowing syndrome testimony. The dangers that the court identified were that the expert may usurp the jury's function, a battle of the experts may result, and there may be an invasion of the victim's privacy. However, the ultimate ruling of the court was that the value of evidence outweighed any of these dangers.

The continuum of expert testimony for rehabilitative purposes runs from the approach adopted in *Kim* to a more conservative approach where testimony is allowed only on specific behavioral instances to which the defendant has opened the door in an attempt to discredit the victim's testimony. This conservative approach permits syn-

[18] The *Kim* court, in a footnote, without saying it was controlling, observed that the trial court refused to allow the testimony as substantive evidence. *Id.* at 600, n 4.

drome testimony only with respect to the specific characteristics that the defendant has attacked.

In *People v Bowker,* 203 Cal App 3d 385; 249 Cal Rptr 886 (1988), the California court applied this approach to test the admissibility of syndrome-type evidence. The court ruled that because syndrome evidence could be misconstrued as a predictor of child abuse, testimony of an expert should be limited to popular "myths" which would have an effect on the jury's consideration as to the credibility of the witness. The use of expert testimony was also limited to rebuttal evidence following an attack by the defendant on the complainant's credibility. The court ruled that the evidence must be targeted at a specific "myth" and gave examples of the appropriate use of the testimony. It stated that if the misconception were disclosure, the prosecutor's evidence would be designed to show that delayed reporting is not inconsistent with child sexual abuse. Further, recantation was another myth which the court specifically gave as an example of how the testimony could be used on rebuttal. One further limitation was placed on the use of such information. The court stated that "[b]eyond the tailoring of the evidence itself, the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." *Id.* at 394. The instruction is intended to protect against the misapplication of the evidence as a diagnostic tool to determine that the complainant is a victim of child sexual abuse.

Between *Kim,* which allows syndrome evidence generally, an evaluation of the child victim characteristics, and an opinion on the believability of the victim, and *Bowker,* which allows testimony concerning only those specific characteristics attacked

and no vouching, is a middle ground which allows the expert to testify in general terms as to any and all behavior patterns that are seemingly inconsistent with crime victims generally.[19]

The only common factor where courts have accepted some use of syndrome evidence, is that the evidence is admissible only to rehabilitate the victim's testimony. However, each case differs with regard to the limitations placed on the use of the rebuttal testimony.

We find that the rebuttal limitation as expressed by the majority of jurisdictions is the preferable approach. Although similar to the conservative theory announced in *Bowker,* we find that the Court of Appeals in *Beckley* best describes what the rule should be in Michigan. Accordingly we would hold that evidence of behavioral patterns of sexually abused children is admissible "for the narrow purpose of rebutting an inference that a complainant's postincident behavior was inconsistent with that of an actual victim of sexual abuse, incest or rape."[20] Therefore, for reasons that will be more fully developed below, we would hold that only those aspects of "child sexual abuse accommodation syndrome," which specifically relate to the particular behaviors which become an issue in the case are admissible.

IV

In Michigan, MRE 702 governs the admissibility of expert testimony:

If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence

---

[19] See, generally, *State v Hall,* 406 NW2d 503 (Minn, 1987).
[20] 161 Mich App 129.

or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Admissibility under this rule requires that the evidence comply with a three-part test. First, the expert himself must be qualified. Second, the evidence must serve to give the trier of fact a better understanding of the evidence or assist in determining a fact in issue. Finally, the evidence must be from a recognized discipline. The determination of whether a witness is qualified to render an expert opinion rests within the discretion of the trial court. Such a determination will not be reversed absent an abuse of discretion.

A

We turn first to an examination of the credentials of the experts who testified in these cases.

MRE 702 defines an expert in general terms, and expertise can be satisfied by a wide array of qualifications. A witness is qualified as an expert by virtue of knowledge, skill, experience, training, or education in a pertinent field. "[W]ithin the scope of the rule are not only experts in the strictest sense of the word, . . . but also the large group sometimes called 'skilled' witnesses . . . ."[21] In cases involving sexual abuse of children, expert testimony has been presented by physicians,[22] crisis counselors,[23] social workers,[24] police officers,[25] and psychologists.[26]

---

[21] FRE 702, advisory committee notes. See also *People v Whitfield,* 425 Mich 116; 388 NW2d 206 (1986).

[22] *People v Kosters,* 175 Mich App 748; 438 NW2d 651 (1989).

[23] *People v Stull,* 127 Mich App 14; 338 NW2d 403 (1983), lv den 422 Mich 939 (1985).

[24] *People v Reinhardt,* 167 Mich App 584; 423 NW2d 275 (1988), lv den 430 Mich 874 (1988).

[25] *People v Stricklin,* 162 Mich App 623; 413 NW2d 457 (1987).

[26] *People v Draper,* 150 Mich App 481; 389 NW2d 89 (1986), lv den 431 Mich 867 (1988).

The study of child sexual abuse is an emerging, if not well-defined, specialized field of human behavior. Not all psychiatrists, psychologists, and social workers will qualify to give expert testimony on the subject. However, in *Jenkins v United States,* 113 US App DC 300; 307 F2d 637 (1962), the court held that lack of a medical degree does not automatically disqualify a witness from rendering an expert opinion.[27] Further, the *Jenkins* court noted that what was determinative was the nature and extent of knowledge and actual experience, not the claim to the title "psychologist."[28] See also *Croda v Sarnacki,* 414 Mich 882; 332 NW2d 712 (1982), rev'g 106 Mich App 51; 307 NW2d 728 (1981). Further, Michigan endorses a broad application of the requirements for qualifying an expert. *Dudek v Popp,* 373 Mich 300, 306; 129 NW2d 393 (1964).

Robin Zollar Smietanka, the expert in *Beckley,* is a certified social worker. She earned a Bachelor of Science degree in special education and a double Master of Arts degree in education and psychol-

---

[27] The issue in *Jenkins* was whether or not a psychologist was competent to give a medical opinion with regard to a mental disease or defect. The defendant raised an insanity defense and presented three psychologists who testified that he had a mental disease on the date of the alleged offenses. The trial court instructed the jury to disregard this testimony. However, the appellate court stated:

> The general rule is that "anyone who is shown to have special knowledge and skill in diagnosing and treating human ailments is qualified to testify as an expert, if his learning and training show that he is qualified to give an opinion on the particular question at issue." "It is not essential that the witness be a medical practitioner." [*Id.* at 307, quoting 32 CJS, Evidence, § 537, pp 261-262 (1942).]

[28] Michigan has regulation and licensing requirements for the practice of psychology. MCL 333.18201 *et seq.;* MSA 14.15(18201) *et seq.*

ogy. Her counseling primarily includes victims of child sexual abuse and victims of incest. Her active caseload in this area began in 1976, and she testified that she has counseled somewhere between 1200 and 1500 child victims.

Lynn Butterfield, an expert in *Badour,* is a family counselor at Lutheran Child and Family Services. She earned a Bachelor's degree in psychology and a Master's degree in counseling psychology. She has been working with children for over five years and approximately ninety percent of her caseload is with sexually abused children.

Dr. Martin Shinedling, another expert in *Badour,* is a psychologist working for Planning for Living. He earned Bachelor's and Master's degrees at California State University at Los Angeles and a doctorate in clinical psychology at Brigham Young University. Further, he is licensed to practice psychology in Michigan.

It is clear from the record, that the experts herein have the appropriate educational background as well as extensive firsthand experience with sexually abused children. Accordingly, the trial court in qualifying each individual as an expert, did not, in our view, abuse its discretion.[29]

B

In addition to assessing a witness' qualifications, the trial judge must also make a determination as to the relevancy of the evidence.[30] The general test of relevancy is whether the evidence has a tendency to render any fact more probable than it would without the evidence. However, a more specific test is applied to expert testimony. Expert

[29] Only in *Badour* did the defendant object to the experts' qualifications.

[30] MRE 401, 402.

testimony is relevant and therefore admissible if it "assist[s] the trier of fact to understand the evidence or to determine a fact in issue . . . ."[31]

This Court has applied the standard announced in MRE 702 as early as 1874 where Justice Campbell wrote:

> [Expert] testimony is not desirable in any case where the jury can get along without it; and is only admitted from necessity, and then only when it is likely to be of some value. [*People v Morrigan,* 29 Mich 4, 8 (1874).]

The test applied in *Morrigan* was further defined by this Court in *People v Zimmerman,* 385 Mich 417, 427; 189 NW2d 259 (1971). The *Zimmerman* Court stated that necessity constitutes the essential factor in determining admissibility. However, basing admission of expert testimony on "need" has been criticized,[32] and more recently this Court

[31] MRE 702.

[32] Expert opinions should only be excluded when " 'they are unhelpful and therefore superfluous and a waste of time.' " *Zimmerman,* 385 Mich 473 (Williams, J., dissenting). See also *People v Bowker,* 203 Cal App 3d 385, 396; 249 Cal Rptr 886 (1988), where Justice Benke, concurring, wrote that the proper test was "whether the proffered evidence will be of any assistance or appreciable help to the factfinder." He quoted from a California Supreme Court case which further explained the appropriate standards:

> "The emphasized words . . . make it clear that the admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury. *It will be excluded only when it would add nothing at all to the jury's common fund of information,* i.e., when 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness.' " [*Id.* at 396-397, quoting *People v McDonald,* 37 Cal 3d 351, 367; 208 Cal Rptr 236; 690 P2d 709 (1984). Emphasis in *Bowker;* citations omitted.]

has stated that the proper standard to be applied is helpfulness to the jury. See *People v Smith,* 425 Mich 98; 387 NW2d 814 (1986). "Generally, the testimony must assist the jury in understanding the evidence or the factual issues, and the witness must have sufficient qualifications 'as to make it appear that his opinion or inference will probably aid the trier in the search for truth.' " *Id.* at 106 (citations omitted). The *Smith* Court quoted the advisory note to FRE 702 for guidance in applying the evidentiary rule which provides:

> "Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. 'There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.' " [*Id.* Citations omitted.]

Advocates of the use of expert testimony in sexual assault cases suggest that without expert testimony jurors cannot properly assess an individual's reaction to a sexual assault.[33] A victim's reactions to a sexual assault, especially if the assailant is a family member, are unique to the particular crime. This uniqueness puts the evidence beyond the jury's ability to properly evaluate the facts in issue absent expert testimony.[34] Further, there is general agreement among ex-

---

[33] The American Psychiatric Association, in its definition of posttraumatic stress disorder has stated that understanding the "development of characteristic symptoms following a psychologically distressing event . . . is outside the range of usual human experience . . . ." DSM-III, n 15 *supra,* § 309.89, p 247. Rape and assault are included within the list of stressors which could produce posttraumatic stress disorder.

[34] In *State v Middleton,* 294 Or 427; 657 P2d 1215 (1983), the

perts that reactions of a victim of sexual assault vary quite significantly from those of a victim of the "average" crime.[35]

The findings of professional research suggest that there are many seemingly inconsistent responses to the trauma of the incident which require some form of explanation. Further, there is considerable authority suggesting that society has a prevailing distrust of the female who complains of rape.[36] This historical distrust of the female complainant is nullified a bit when dealing with child sexual abuse; however, such distrust is not eliminated. It is not surprising that jurors would be skeptical about a child's complaint of sexual abuse because of a child's susceptibility to external

Oregon Supreme Court relied on the responses of the jury pool during voir dire to support its conclusion that the average individual is unfamiliar with the emotional trauma associated with sexual assault. The *Middleton* court noted that of the eighteen prospective jurors questioned, fifteen people had never personally been exposed to an individual who had been sexually abused. Two of the prospective jurors had heard reports of abuse and the third was excused because she had extensive knowledge of sexual abuse. Without the expert testimony "jurors may impose standards of normalcy on child victim/ witnesses who consistently respond in distinctly abnormal fashion." *Id.* at 440. (Roberts, J., concurring.)

[35] Generally, courts draw comparisons to crimes against property. In *State v Myers*, 359 NW2d 604, 610 (Minn, 1984), the court reasoned that jurors have the competence within their common experience to test the credibility of witnesses for "most crimes." For example, "[i]f the victim of a burglary failed to report the crime promptly, a jury would have good reason to doubt that person's credibility." However, the court found that assessment of a witness in a sexual abuse case was out of the common experience of the jury.

Similarly, in *State v Middleton*, n 34 *supra*, the court reasoned that a jury would have good cause to doubt the credibility of a burglary victim who after making an initial report recanted the allegation several times before trial. Further, in *Middleton*, the court stated that it was within the common experience of jurors to weigh the credibility of victims of a physical assault because they are capable of personalizing the emotions and trauma. However, familial sexual abuse produces a "unique trauma" beyond a juror's understanding. *Id.* at 440. (Roberts, J., concurring.)

[36] Comment, *Checking the allure of increased conviction rates: The admissibility of expert testimony on rape trauma syndrome in criminal proceedings*, 70 Va L R 1657 (1984).

influences.[37] Further, there seems to be a prevalent
view that children fantasize about sexual acts.
Another possible misconception concerning the
child victim is the belief that when a child suffers
an injury it will be reported immediately. How-
ever, postponement of disclosure is readily viewed
by experts as consistent with the behavioral pat-
terns of a child who has been sexually abused.
Other suggested misconceptions are that sex of-
fenders are always strangers and that physical
injury will almost always result from the inci-
dent.[38]

Given the possibility of these misconceptions, it
would be helpful and appropriate to allow expert
testimony in child sexual abuse cases.

Additionally, the evidence is relevant and help-
ful to a jury because of the nature of the crime. In
most criminal sexual conduct cases there are no
nonparticipant witnesses to the crime, which re-
duces the cases to weighing the defendant's credi-
bility against that of the victim's.[39] Even more
important is the fact that, at least in *Badour*, we
are dealing with a child of tender years. Generally,
children of such a young age will have difficulty on
the witness stand, and therefore their credibility
may easily be attacked by the defense. Further,
given the fact that disclosure in child sexual abuse
cases is generally delayed because of coercion,
guilt, or some other reason, there will be no physi-
cal evidence to corroborate the victim's allegations.
Therefore we hold that expert testimony will,

[37] Girdner, *Out of the mouths of babes,* 5 Cal Law 57 (June, 1985).

[38] See, generally, Cacciola, *The admissibility of expert testimony in
intrafamily child sexual abuse cases,* 34 UCLA L R 175, 178-179
(1986).

[39] In *People v DerMartzex,* 390 Mich 410; 213 NW2d 97 (1973), this
Court recognized that the principle issue in cases involving criminal
sexual conduct is the credibility of the complainant. See also *People v
LaLone,* 432 Mich 103; 437 NW2d 611 (1989).

under certain circumstances, assist the jury in understanding the evidence.

C

The final inquiry under MRE 702 is whether the testimony is derived from a "recognized scientific, technical, or other specialized knowledge . . . ." Defendants do not argue, nor do we suggest, that the mental health discipline is not a recognized field of specialized knowledge. It is undeniable that there is an emerging cadre of social and behavioral scientists and clinicians who specialize in the treatment and the study of the victims of child sexual abuse. It would further deny reality not to recognize this field of practice and study. However, defendants do object to any expert testimony based on child sexual abuse syndrome because there is no fixed syndrome which is recognized by the profession.[40] Thus it is urged upon us that when the subject of the expert testimony is child sexual abuse syndrome, the reliability of the evidence should be examined under the principles of the *Davis/Frye* test.

Although not specifically mentioned in the evidentiary rule, the *Davis/Frye* test has been engrafted by case law to determine whether a novel scientific principle or technique is "recognized" within the relevant scientific community. It is a test whereby the trial court, in determining admissibility, judges the reliability of the scientific principle or technique as a threshold matter. The foundational requirement for admissibility under the *Davis/Frye* test is that the proponent of the evidence must show that the scientific principle or technique has gained such general acceptance within the scientific community as to render the

---

[40] See n 15.

technique or principle reliable. Further, general
scientific acceptability must be established by dis-
interested scientists.[41] The *Davis/Frye* test restricts
the admissibility of relevant evidence on the basis
of general scientific acceptance to ensure that a
jury is not relying on unproven and ultimately
unsound scientific methods. Further, it protects
against the jury being overcome by the aura of the
expert's testimony about the results or the infer-
ences drawn from the testing procedure. The
*Davis/Frye* test seeks to ensure that the jury is the
ultimate factfinder and that it will not "abandon
its responsibility to decide the critical issues and
simply adopt the judgment of the expert [because
of] an inability to accurately appraise the validity
of the underlying science."[42]

Although the *Frye* test has been criticized by
commentators, this Court reaffirmed its applica-
tion in *People v Young,* 418 Mich 1; 340 NW2d 805
(1983).[43] The *Davis/Frye* test has been applied in
Michigan to various scientific devices and tech-
niques;[44] however, as a general rule, the *Davis/*

[41] *People v Barbara,* 400 Mich 352, 376; 255 NW2d 171 (1977).

[42] *State v Rimmasch,* 775 P2d 388, 396 (Utah, 1989).

[43] In *Young,* results of a blood analysis obtained through the use of
serological electrophoresis were admitted into evidence for the pur-
pose of showing that defendant fit within the class of people who
could have committed the charged offense. The trial court did not
hold an evidentiary hearing as to the admissibility of the evidence.
This Court remanded the case to the trial court for the purposes of
conducting an evidentiary hearing to determine the admissibility of
the test results. The Court noted that

> [a]lthough we do not doubt that the technique of electrophor-
> esis enjoys general acceptance as a diagnostic and a research
> tool, the record before us is devoid of impartial and disinter-
> ested expert opinion that serological electrophoresis is sensitive
> and specific in measuring what it purports to measure. [*Id.* at
> 22.]

[44] *People v Soltis,* 104 Mich App 53; 304 NW2d 811 (1981), modified
on other grounds 411 Mich 1037; 309 NW2d 186 (1981) (spectropho-

*Frye* test has not been applied to behavioral sciences.

> Psychologists, when called as experts, do not talk about things or objects; they talk about people. They do not dehumanize people with whom they deal by treating them as objects composed of interacting biological systems. Rather, they speak of the whole person.[45]

Thus, it is difficult to fit the behavioral professions within the application and definition of *Davis/Frye.*

This principle is best illustrated by the admissibility of a psychiatrist's testimony in a criminal trial on the issue of insanity. See, e.g., *People v Martin,* 386 Mich 407, 421; 192 NW2d 215 (1971). In *Martin,* we recognized that the "field of human medicine" has a limited use as evidence in a criminal trial because it lacks reliability. However, we did not exclude the evidence, nor did we submit the evidence to scrutiny under the *Davis/Frye* test.

---

tometer test results); *People v Wesley,* 103 Mich App 240; 303 NW2d 194 (1981) (fingernail identification procedure); *People v Ebejer,* 66 Mich App 333; 239 NW2d 604 (1976); *Dudek v Popp,* 373 Mich 300; 129 NW2d 393 (1964) (accident reconstruction evidence); *People v Stark,* 73 Mich App 332; 251 NW2d 574 (1977); *Moreman v Kalamazoo Co Rd Comm,* 129 Mich App 584; 341 NW2d 829 (1983) (chemical analysis of blood urine or breath to determine alcohol content); *People v Farnsley,* 94 Mich App 34; 287 NW2d 361 (1979) (causes of fires, controlled substance analysis); *O'Dowd v Linehan,* 385 Mich 491; 189 NW2d 333 (1971); *People v Williams,* 26 Mich App 218; 182 NW2d 347 (1970) (footprints, palm prints, and fingerprints); *People v Watkins,* 78 Mich App 89; 259 NW2d 381 (1977); *People v Collins,* 43 Mich App 259; 204 NW2d 290 (1972) (hair samples); *People v Ferency,* 133 Mich App 526; 351 NW2d 225 (1984) (speed radar); *People v O'Brien,* 113 Mich App 183; 317 NW2d 570 (1982); *People v Riemersma,* 104 Mich App 773; 306 NW2d 340 (1981) (dog-tracking evidence); *People v Barbara,* n 41 *supra* (polygraph tests); *People v Cox,* 85 Mich App 314; 271 NW2d 216 (1978) (truth serum); *People v Tobey,* 401 Mich 141; 257 NW2d 537 (1977) (voiceprints); *People v Gonzales,* 415 Mich 615; 329 NW2d 743 (1982) (hypnosis).

45 Lorenzen, n 16 *supra* at 1035.

The ultimate testimony received on syndrome evidence is really only an opinion of the expert based on collective clinical observations of a class of victims. Further, the issues and the testimony solicited from experts are not so complicated that jurors will not be able to understand the "technical" details. The experts in each case are merely outlining probable responses to a traumatic event. It is clearly within the realm of all human experience to expect that a person would react to a traumatic event and that such reactions would not be consistent or predictable in all persons. Finally, there is a fundamental difference between techniques and procedures based on chemical, biological, or other physical sciences as contrasted with theories and assumptions that are based on the behavioral sciences.

We would hold that so long as the purpose of the evidence is merely to offer an explanation for certain behavior, the *Davis/Frye* test is inapplicable.

V

Having set forth the standards governing admissibility of the testimony, we turn now to the limitations on its use.

The use of expert testimony in the prosecution of criminal sexual conduct cases is not an ordinary situation.[46] Given the nature of the offense and the terrible consequences of a miscalculation—the consequences when an individual, on many occasions a family member, is falsely accused of one of society's most heinous offenses, or, conversely, when one who commits such a crime would go

---

[46] We do not dispute the analysis employed by Justice BOYLE in an ordinary case where expert testimony is admissible. However, for the reasons stated above, these cases present unusual circumstances.

unpunished and a possible reoccurrence of the act would go unprevented—appropriate safeguards are necessary. To a jury recognizing the awesome dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat. Therefore admissibility of expert testimony, under the limitations set forth in this opinion, is an effort to accommodate the uniqueness of the child victim's reactions while at the same time avoiding undue reliance on such testimony. The expert testimony offered is based at best on an inexact scientific foundation, and therefore the evidence is only admissible when a victim's behavior becomes an issue in the case.[47]

## A

We note first that child sexual abuse syndrome evidence is essentially a therapeutic tool. The syndrome is merely "umbrella terminology" which serves only to define the broad range of *possible* physical, psychological, and emotional reactions that a child victim could potentially experience.[48] Its purpose is to provide "a 'common language' for the professionals working to protect sexually abused children."[49] It is not intended as a diagnostic tool for detection of sexual abuse. Thus, it has no probative value in terms of being able to detect

[47] We recognize that the use of syndrome type, expert testimony, is still in its embryonic stage, and thus, as behavioral science experts continue to accumulate information on children's behavioral reactions there is the possibility that syndrome testimony will become a more reliable source of evidence. To this extent, as the science develops, it may move us to reevaluate the question and allow admission of the evidence beyond the limitations expressed today.

[48] *People v Bledsoe,* 36 Cal 3d 236; 203 Cal Rptr 450; 681 P2d 291 (1984).

[49] Myers, *Child Witness Law & Practice* (New York: John Wiley & Sons, 1989 cumulative supplement), § 4.17C.

sexual abuse on the basis of the existence of certain behavioral characteristics.[50]

The existence of the syndrome assumes the presence of abuse and merely seeks to explain an individual child's reaction to it. For example, in *People v Gray*, 187 Cal App 3d 213; 231 Cal Rptr 658 (1986), a child psychologist testified that the syndrome itself could not be diagnosed or tested, but rather was an attempt on the part of psychologists to identify traits and characteristics of child sexual abuse. Similarly, Justice Benke, concurring in *People v Bowker, supra,* defined syndrome as "nothing more than a set of symptoms which tend to occur together" but which do not resolve the question whether abuse occurred. 203 Cal App 3d 397.

Admitting evidence that a syndrome exists can be prejudicial to a defendant because the experts are in general agreement that there is no single specific set of characteristics that can be attributed to every individual in diagnosing child sexual abuse.[51] Within the group of sexually abused children there is a significant variation among the

---

[50] In *Bledsoe,* n 48 *supra,* the court concluded:

> Given the history, purpose and nature of the rape trauma syndrome concept, we conclude that expert testimony that a complaining witness suffers from rape trauma syndrome is not admissible to prove that the witness was raped. We emphasize that our conclusion in this regard is not intended to suggest that rape trauma syndrome is not generally recognized or used in the general scientific community from which it arose, but only that it is not relied on in that community for the purpose for which the prosecution sought to use it in this case, namely, to prove that a rape in fact occurred. Because the literature does not even purport to claim that the syndrome is a scientifically reliable means of proving that a rape occurred, we conclude that it may not properly be used for that purpose in a criminal trial. [36 Cal 3d 251. Cited with approval in *People v Pullins,* 145 Mich App 414, 421; 378 NW2d 502 (1985).]

[51] In fact, those experts who have tried to establish some universal symptomology of sexual abuse victims sometimes

factors that can be observed and diagnosed. "There is no single effect that has been observed in all children. Whether there is some unique and specific effect of sexual abuse is unknown."[52] Therefore, what the expert and the practitioner must look for are certain behavioral patterns of the victim in a given case that are representative of sexually abused children generally.

Indeed, the evidence has a very limited use and should be admitted cautiously because of the danger of permitting an inference that as a result of certain behavior sexual abuse in fact occurred, when evidence of the syndrome is not a conclusive finding of abuse. Although syndrome evidence may be appropriate as a tool for purposes of treatment, we would hold that it is unreliable as an indicator of sexual abuse.[53]

As reliability diminishes, the prejudicial effect of the evidence increases. Evidence, although relevant, is excluded when its probative value is substantially outweighed by any unfair prejudice.

---

seem to belie their own theory. An employee of the sexual assault center testified in [*State v*] *Maule* [35 Wash App 287; 667 P2d 96 (1983)] that the typical victim of intrafamily sexual abuse shows regressive behavior and acts like a younger child. Had she read some of the most widely cited literature on the subject, the employee might have found that, on the contrary, the typical victim of sexual abuse displays "pseudomature seductive behavior." The same expert testified that it is typical for the child to act withdrawn, but had she read an often cited paper on characteristics of sexual abuse victims, she might have found that such children typically display " 'acting out' behavior." In *Kim*, the expert testified that abused children typically display a negative view of sex, but is this consistent with a symptomology of "sexual abuse syndrome" that includes frequent masturbation and/or pseudoseductive behavior? [Note, *The unreliability of expert testimony on the typical characteristics of sexual abuse victims,* 74 Georgetown L J 429, 441 (1985).]

[52] Myers, *Expert testimony in child sexual abuse litigation,* 68 Neb L R 1, 61 (1989).

[53] See comment, n 36 *supra,* for a detailed description of the studies conducted concerning sexual abuse syndrome.

MRE 403.[54] Accordingly, we would hold that the admissibility of syndrome evidence is limited to a description of the uniqueness of a specific behavior brought out at trial.

In keeping with the purpose for which the evidence is admissible (i.e., to provide background data relevant to an evaluation of this victim's behavior), the party offering the testimony must identify the specific behavior or statement at issue in the case. Further, because there is no fixed syndrome[55] that collectively defines the profile of the typical child who has been sexually abused, expert testimony must be tailored individually to each particular behavior at issue in the case. Expert testimony is only admissible to cast light on the individual behaviors observed in the complainant, therefore the expert must not render an opinion that a particular behavior or a set of behaviors observed in the complainant indicates that sexual assault in fact occurred. We note that generally effective cross-examination will prevent the jury from drawing such a conclusion; however, a limiting instruction may also be necessary and should be given on request.

### B

Once qualified to give an expert opinion, MRE 702 does not limit the scope of the expert's testi-

[54] The analysis set forth in Justice Boyle's concurring opinion centers only upon relevancy as a rationale for admissibility of syndrome-type evidence. As in many other evidentiary situations, because evidence is relevant and will aid the jury in understanding the issues does not preclude other considerations that argue for limitation.

[55] This Court in *People v Petrella,* 424 Mich 221, 267; 380 NW2d 11 (1985), expressly recognized that "[d]espite the behavioral patterns of rape victims that have been observed (labeled by some as 'rape trauma syndrome'), we are not persuaded that it is psychologically or sociologically sound to assume that there is a 'normal' or 'average' emotional reaction to being raped."

mony. However, "[t]he expert must be an expert in the precise problem as to which he undertakes to testify." *Zimmerman, supra* at 453 (ADAMS, J., separate opinion).

A person qualifies as an expert under the scientific study of behavior when there is "mastery of a specialized field of knowledge about a group of either children who have been sexually misused, or adults who have sexually misused children."[56] In this light, the expertise of the witness does not center upon the complainant in any individual case. Rather, the expertise of the testifying expert concerns only whether the specific behavior at issue is commonly or uncommonly associated with sexually abused children as a class.

We emphasize that the purpose of allowing expert testimony in these kinds of cases is to give the jury a framework of possible alternatives for the behaviors of the victim at issue in the case in relation to the class of abuse victims. In this respect, the expert's role is to provide sufficient background information about each individual behavior at issue which will help the jury to dispel any popular misconception commonly associated with the demonstrated reaction. Thus to assist the jury in understanding the unique reactions of victims of sexual assault, the testimony should be limited to whether the behavior of this particular victim is common to the class of reported child abuse victims. The expert's evaluation of the individual behavior traits at issue is not centered on what was observed in this victim, but rather whether the behavioral sciences recognize this behavior as being a common reaction to a unique criminal act. Therefore we would hold that because a witness qualifies as an expert because of

---

[56] Lorenzen, n 16 *supra* at 1043-1044.

knowledge and experience in dealing with others who have been abused, and not on the basis of an examination of the particular victim, the expert's testimony should be confined to an explanation of the behavior traits at issue, as defined by the science that forms the basis of the expertise. This rule does not preclude a party from questioning an expert regarding the expert's familiarity or understanding of the victim's behavior at issue. Further, the expert is allowed to define the victim's behavior in terms of the factual background that may have a relationship to those aspects of the victim's behavior which become evidence in the case. However, an expert cannot introduce new facts based on personal observations of the complainant unless the evidence would be otherwise admissible.

We also note that MRE 704 provides that the opinion provided by the expert can "embrace[ ] an ultimate issue to be decided by the trier of fact."

> Nevertheless, there is a meaningful distinction between expert testimony that a particular child was sexually abused, and expert testimony that a child demonstrates behaviors commonly observed in the class of sexually abused children. In the latter case, the expert does not offer a direct opinion on the ultimate question of whether abuse occurred.[57]

Therefore, any testimony about the truthfulness of this victim's allegations against the defendant would be improper because its underlying purpose would be to enhance the credibility of the witness. To hold otherwise would allow the expert to be seen not only as possessing specialized knowledge in terms of behavioral characteristics generally associated with the class of victims, but to possess

---

[57] Myers, n 49 *supra.*

some specialized knowledge for discerning the truth. "Psychologists and psychiatrists are not, and do not claim to be, experts at discerning truth. Psychiatrists are trained to accept facts provided by their patients, not to act as judges of patients' credibility."[58]

It was for similar reasons that we limited the use of psychological evidence in *People v LaLone,* 432 Mich 103, 109; 437 NW2d 611 (1989). In *LaLone,* we tested whether hearsay statements regarding the identity of the perpetrator of a crime were admissible under the MRE 803(4) hearsay exception. The witness in *LaLone* was a psychologist who "treat[ed] mental and emotional disorders rather than physical ones." Evidence is admissible under MRE 804(3) because of its reliability, i.e., patients normally do not fabricate with regard to the cause of an injury or when they may have pain. The statements made to a doctor are cloaked with a sense of reliability because accuracy is necessary for diagnosis and treatment. Further, we noted that those in the mental health profession generally work with statements that are both true and untrue in diagnosing and treating a patient for a mental disorder. Mental health professionals generally only receive information from the patient. They start with the basic assumption that the history they receive is what the patient believes to be the truth, not necessarily what actually is the truth. Thus, in *LaLone,* we ruled that statements made to a psychologist were less reliable than those made to a physician and were not within the specific language of the rule which allows evidence of information necessary for medical treatment or medical diagnosis.

---

[58] *People v Moran,* 151 Ariz 378, 385; 728 P2d 248 (1986), citing *People v Bledsoe,* n 48 *supra* at 250; *United States v Azure,* 801 F2d 336 (CA 8, 1986).

Accordingly, we find that appropriate expert testimony is limited to providing the jury with background information, relevant to the specific aspect of the child's conduct at issue, which it could not otherwise bring to its evaluation of the child's credibility.[59] We caution that to permit the expert witness to render a legal conclusion regarding whether abuse in fact occurred, exceeds the scope of the rule. The conclusion whether abuse occurred is outside the scope of expertise, and therefore not a proper subject for expert testimony. The jury must make its own determination from the totality of the evidence whether the complainant was sexually abused.

"It should be kept in mind that those who write about sexual abuse of children are normally child advocates who research and write with the paramount goal of protecting abused children."[60] Given the abhorrence of the crime, it is inevitable that those who treat a child victim will have an emotional inclination toward protecting the child victim. The expert who treats a child victim may lose some objectivity concerning a particular case. Therefore to avoid the pitfall of the treating professional being inclined to give an opinion regarding whether the complaining witness had been sexually abused, we caution the trial court to carefully scrutinize the treating professional's ability to aid the trier of fact when exercising discretion in qualifying such an expert witness.[61]

VI

In *Beckley,* the trial judge specifically stated that the prosecution could present expert testi-

---

[59] *State v Myers,* n 35 *supra* at 610.

[60] 74 Georgetown L J, n 15 *supra* at 440.

[61] While obviously outside the realm of expert testimony, a child abuse professional is not precluded from giving otherwise admissible testimony about the child victim.

mony because "it . . . appear[ed] that defendant
would raise these issues by attack on the credibil-
ity of the complainant . . . ." Also, the trial court
limited the testimony to whether any of the behav-
iors observed in the victim were consistent with
the profile of an incest victim. The trial court took
great care to limit the expert testimony offered to
only those aspects of the victim's behaviors that
were relevant to the case and to minimize the
prejudice to defendant. Therefore, we would hold
that the trial judge did not abuse his discretion by
allowing expert testimony in this case.

Because the "profile" of this victim included
only four specific responses to the alleged incident,
the trial judge accordingly limited the expert's
testimony. Although the expert's testimony was
limited, on cross-examination, redirect examina-
tion and recross examination the testimony went
beyond the scope of the appropriate limitation.
The net result of Ms. Smietanka's testimony was
exposure of the jury to a wide range of behavioral
characteristics attributed to the "syndrome" gen-
erally. However, Ms. Smietanka did not specifi-
cally testify with regard to the "syndrome," but
rather spoke only in terms of general behavioral
patterns. Further, the word syndrome was not
used, nor was there any mention of definitional
behaviors commonly associated with child sexual
abuse syndrome. Thus the jury was not left with
the impression that there exists a collective set of
behaviors attributable to sexually abused children.
In this light, Ms. Smietanka continued to be objec-
tive and was acting in an advisory role.

Additionally we note that Ms. Smietanka, as the
treating professional, was allowed to give an opin-
ion as to the particular child victim. Specifically,
on cross-examination she testified:

*Q.* Is there anything that is in fact inconsistent with sexual abuse?

*A.* Yes. There are some things that are very inconsistent with sexual abuse, and those are indicators that you look for when you are doing an initial diagnosis to set up a treatment plan.

*Q.* I see. Are any of those things that you've seen in this case?

*A.* In this case I have not seen things that would lead me to believe that this particular child was not sexually abused. I have seen things that would lead me to believe that, given the set of experiences and the circumstances, that they would fit the criteria for someone who has been sexually abused.

This is an example of a line of questioning which, on direct examination, would be inappropriate. However, it was defense counsel who opened the door to this line of questioning and who elicited this response from the testifying expert. Defendant's question was direct, and he left open the possibility that the expert would respond negatively and in a manner that could be construed as an expert conclusion with regard to the truthfulness of the victim's allegations. On direct examination, similar testimony crosses the line of acceptability, yet in this case reversal is not required in view of the fact that the response was brought out by defendant. Defendant cannot now complain that the expert's testimony served to vouch for the complainant's credibility when he allowed and in fact drew out the response. To hold otherwise would allow defendant an appellate parachute to escape conviction because of damaging testimony that turns the tide toward the believability of the complainant's allegations. Although we would hold that it is only appropriate to allow a background explanation of the behaviors at issue, the increased scope of the testimony under the facts of

this case did not prejudice defendant; thus, reversal is not warranted.

Accordingly, in *Beckley,* we would affirm the rulings of the lower courts.

In *Badour* the trial court disallowed testimony concerning the "fixed syndrome" as a predictor of sexual abuse because it lacks sufficient scientific reliability. However, the trial judge ruled "that an expert, on their [sic] own experience, and training, and knowledge, can make observations and give . . . their conclusions about those observations, even to the degree that, in their opinion, these children, or this child, showed indicia of being sexually abused."

Unlike *Beckley,* the trial court in *Badour* was not sensitive to the need to restrict the expert's testimony and failed to address the purpose for which the evidence was admitted. The trial court allowed expert testimony without consideration regarding whether the behaviors of this victim were an issue in the case. Further, the trial court made no determination as to whether the evidence would be helpful to rebut any inference that would necessarily result when the complainant's post-incident behavior became an issue in the case. We do note that the trial judge did not have an opportunity to exercise discretion in this area because the expert was the first witness called to testify. Even so, the net effect of the trial court's ruling was to allow the expert to give testimony beyond that necessary to help the jury to understand the victim's behavior. The testimony was not limited to background information; thus, the expert's role was heightened from that of advisor to one of advocate. The consequences of the ruling were to allow the expert to vouch for the complainant's credibility which left the jury with the

impression that, in the expert's opinion, the victim had in fact been abused.

Because the testimony in *Badour* exceeded the scope of the rules announced, we would reverse and remand the case for a new trial.

CONCLUSION

On the basis of the origins, the purpose, and the limitations of the so-called child sexual abuse syndrome, we are unwilling to have such evidence introduced as a scientific tool, standing on its own merits as a doctrine or bench mark for determining causality in child sexual abuse cases. However, we think, as do so many jurisdictions who have grappled with the phenomenon, that behavior attributed to the syndrome has a place in expert evidence jurisprudence in child sexual abuse cases. There has developed a body of knowledge and experience about the symptomatology of child abuse victimization. We therefore conclude and would hold that persons otherwise properly qualified as experts in dealing with sexually abused children should be permitted to rely on their own experience and their knowledge of the experience of others to rebut an inference that specific behavioral patterns attributed to the victim are not uncharacteristic of the class of child sexual abuse victims. Such witnesses should be permitted to testify regarding characteristics of sexually abused children so long as it is without reference to a fixed set of behaviors constituting a "syndrome." It should, therefore, be the knowledge of the expert that carries the day, not the "syndrome" doctrine. Expert testimony should be admissible only to the extent that it is directed towards providing an explanation of a specific behavior attributable to the complainant.

Further, because syndrome evidence is not a technique or principle which can predict abuse and its use is merely to explain behavior, the *Frye/Davis* test is inapplicable. The evidence is only an expert's opinion which explains and describes probable responses to a traumatic event.

*Badour* should be reversed and remanded for a new trial, and *Beckley* affirmed.

LEVIN and GRIFFIN, JJ., concurred with BRICKLEY, J.

BOYLE, J. I concur in the lead opinion to the extent that it holds 1) that the *Davis/Frye* test is inapplicable to the expert testimony in question, 2) that syndrome evidence is not admissible to prove that sexual abuse occurred, 3) that an expert may not testify that a child is telling the truth, and 4) that an expert may testify that the behavior of the complainant in the particular case is consistent with that of children who report sexual abuse.

I write separately because I am concerned that the rationale employed in the lead opinion may create restrictions on the use of expert testimony in child sexual abuse cases that unnecessarily limit an expert's ability to assist the factfinder. Expert testimony should be admitted where relevant and helpful to the jury in evaluating the witness' credibility. Among the many ways in which relevance may be made clear are motions in limine, voir dire, opening statement, the child's direct examination, the testimony of other prosecution witnesses, cross-examination of the child, or by the defendant's proofs. An expert may not testify that the child was abused. An expert may not render an opinion that the defendant was the abuser. A qualified expert may, however, compare the behavior of the complainant with that exhib-

ited by sexually abused children and offer an opinion regarding whether the behavior is consistent, if such an opinion will assist the jury. Jurors are capable of understanding that the testimony is offered solely to assist them in determining the credibility of the victim, and that the ultimate determination of whether abuse occurred is theirs alone.

I

The sole issue presented today is whether the expert testimony, as it relates to an issue in the case, would be helpful to the factfinder. Expert testimony which does not relate to any issue in the case is not relevant and therefore not helpful. Helpfulness is the touchstone of admissibility expressed in both MRE 702 and FRE 702:

> The helpfulness test subsumes a relevancy analysis. In making its determination, the court must proceed on a case-by-case basis. Its conclusions will depend on (1) the court's evaluation of the state of knowledge presently existing about the subject of the proposed testimony and (2) on the court's appraisal of the facts of the case. [3 Weinstein & Berger, Evidence, ¶ 702(02), p 702-18.]

Thus, the proper resolution of these cases begins with relevancy. Relevancy exists only as a relation between an item of evidence and a matter properly provable in the case. The kind of fact to which proof may properly be directed is a fact that is of consequence to the determination of the action. MRE 401. "The fact to be proved may be ultimate, intermediate, or evidentiary." 1 Weinstein & Berger, *supra,* pp 401-3 through 401-4. However, as the advisory committee to the federal rules stated, "The fact to which the evidence is directed need

not be in dispute." *Id.,* p 401-4. Thus, evidence which is not related to a proposition such as the elements of the claim or crime that must be proved (the consequential fact), may be "admitted for other purposes including: to establish background information, [or] to evaluate the credibility of a witness . . . ." *Id.,* ¶ 401[05], p 401-29.

> In these instances, the test is not whether the proffered evidence tends to prove or disprove any consequential fact, but rather whether the evidence will aid the court or jury in determining the probative value of other evidence offered to affect the probability of the existence of a consequential fact. [*Id.*]

The lead opinion recognizes that expert testimony will assist the jury in evaluating the testimony of the child witness, noting various "misconceptions" about a child's behavior following sexual abuse and that sexual abuse prosecutions often amount to a credibility contest between the victim and the defendant.[1] However, the lead opinion erroneously characterizes expert testimony in these cases as "rebuttal" or "rehabilitat[ive]" evidence (*ante,* p 710), going so far as to say it is never admissible as "substantive" evidence. What the lead opinion seems to mean is that it is not admissible with regard to the issue of guilt, a proposition with which I agree. However, when credibility is an issue in the case, then expert testimony addressing that issue is admissible if it will assist the jury, and it is substantive evidence. Thus, numerous jurisdictions allow the use of expert testimony to assist the jury in evaluating credibility, without reference to rehabilitation or

---

[1] *Ante,* pp 716-717.

rebuttal.[2] The basic relevancy/helpfulness principles suggest the appropriate limitations on expert testimony in child abuse cases. First, the testimony is not admissible where offered to prove that the act occurred because experts have no demonstrated ability to reliably make such a determination.[3] Second, an expert may not evaluate the credibility of the complainant; as the majority notes, psychologists are not qualified to judge veracity.[4] However, the expert's testimony is admissible to assist the factfinder in its evaluation of credibility.

[2] *Wheat v State,* 527 A2d 269, 275 (Del, 1987) (an expert may provide "background" to assist the jury in determining a child's credibility where there has been delayed reporting or recantation); *State v Kennedy,* 320 NC 165; 357 SE2d 359 (1987) (expert testimony is admissible to help the jury understand behavior patterns of sexually abused children and assist it in assessing the credibility of a victim); *Rodriquez v State,* 741 P2d 1200, 1204-1205 (Alas App, 1987) (expert testimony was held admissible to provide "background information" to aid the jury in evaluating testimony of witnesses and to explain the unusual behavior of the complainant); *State v Hall,* 406 NW2d 503, 505 (Minn, 1987) (where the victim is an adolescent, expert testimony regarding reporting conduct and continued contact with the assailant is admissible in the discretion of the trial court).

[3] The diagnosis of sexual abuse is problematic for those in the field. Children do not exhibit uniform reactions to sexual abuse. Haugaard & Repucci, *The Sexual Abuse of Children* (San Francisco: Jossey-Bass Publishers, 1988), p 135. Conclusive physical evidence is available only in a minority of cases, *id.,* p 151, leaving as a basis for "diagnosis" the child's statements and behaviors. The difficulty here, however, is that the behaviors identified with sexual abuse may be caused by stresses other than sexual abuse. *Id.,* p 143; de Young, *A conceptual model for judging the truthfulness of a young child's allegation of sexual abuse,* 56 Am J Orthopsychiatry 550, 555 (1986).

[4] Those who deal with sexually abused children readily admit that judging the veracity of a child who complains of sexual abuse is a problem within the mental health profession. Even for these experts, assessment of the credibility of a child's accusation is "a complicated and inexact process." Haugaard & Repucci, n 3 *supra,* p 179. The difficulty of the problem is attested to by the profusion of articles addressing the question of how to assess the truthfulness of a child's accusation of sexual abuse. See, e.g., Faller, *Criteria for judging the credibility of children's statements of their sexual abuse,* 67 Child Welfare 389 (1988); de Young, n 3 *supra*; Wehrspann, Steinhauer & Klajner-Diamond, *Criteria and methodology for assessing credibility of sexual abuse allegation,* 32 Can J Psychiatry 615 (1987).

If, as the lead opinion finds, it is clear that expert testimony is frequently helpful in evaluating the credibility of a child sexual abuse complainant, it should be equally clear that its usefulness can become apparent in a variety of ways. Inferences arising from common myths or misconceptions may arise from sources such as a mother's statement that shows delayed reporting, a foster parent's recital of seductive behavior, or a teacher's revelation of sexual activity by the child victim with other children. Where there is no physical corroboration of a young child's accusation, credibility is uniquely critical; where the testimony is halting or without affect, memory and testimonial competence are in question; where the offender and the parent have separated, there may be an inference that the child is a pawn in the adult dispute; if the offender and the parent remain together, an argument may be advanced that the accusations are motivated by the child's having been disciplined for poor school work, rebelliousness, or sexual activity. As review of the hundreds of cases before us on application for leave to appeal evidences, the relevance and helpfulness of such testimony to the credibility question may become apparent at preliminary examination, during discovery, at pretrial motions, in the case in chief, or from the defendant's proofs.

II

The lead opinion's inclination to limit the specificity of the expert's testimony is founded on a misapprehension of the nature and purpose of expert testimony in general. The lead opinion emphasizes that "the expertise of the witness does not center upon the complainant in any individual case," and reasons that "because a witness quali-

fies as an expert because of knowledge and experience in dealing with others who have been abused, and not on the basis of an examination of the particular victim, the expert's testimony should be confined to an explanation of the behavior traits at issue, as defined by the science that forms the basis of the expertise."[5] The theme, not explicitly stated, is that since the expertise of the expert stems from general knowledge and not from knowledge of the particular case, the expert's testimony should focus on generalities and not on the case at hand. However, it is typically true of any expert that expertise is derived from general experience or knowledge, rather than from experience or knowledge concerning the facts of the case in which the expert is qualified. Yet that does not preclude the expert from applying general principles or knowledge to the facts at hand. Indeed, it is the ability to do so which distinguishes an expert from a lay witness:

> An observer is qualified to testify because he has firsthand knowledge of the situation or transaction at issue. The expert has something different to contribute. This is the power to draw inferences from the facts which a jury would not be competent to draw. [McCormick, Evidence (3d ed), § 13, p 33.]

Thus, I would not relegate the expert to a role which is merely advisory. I would permit the expert to testify that the particular child's behavior is consistent with behavioral characteristics observed in children assumed to have been abused. The limitation suggested by the lead opinion's reasoning is inconsistent with its own finding that expert testimony in child abuse cases is admissible

---

[5] *Ante,* pp 726-727.

to help the factfinder, since the jury will presumably be most helped by an expert who is allowed to apply expert knowledge to the case at hand. As the United States Court of Appeals for the Eighth Circuit observed in *United States v Azure*, 801 F2d 336, 340 (CA 8, 1986):

> [The doctor] might have aided the jurors without usurping their exclusive function by generally testifying about a child's ability to separate truth from fantasy, by summarizing the medical evidence and expressing his opinion as to whether it was consistent with [the victim's] story that she was sexually abused, or perhaps by discussing various patterns of consistency in the stories of child sexual abuse victims and comparing those patterns with patterns in [the victim's] story.

The lead opinion's formulation, and to an even greater extent the dissent's, would impose on the expert a variation of the sterile inquiry previously imposed on character testimony, where the witness will be qualified and then answer one or two sanitized questions.

In sum, I would hold that an expert should not be permitted to appropriate the jury's function by testifying that a child witness is truthful. Nor may the behavioral expert in a child abuse case testify on the basis of behavior for the purpose of establishing that a sexual abuse occurred. An expert witness may testify in child sexual abuse cases where the expert's testimony would assist the factfinder in evaluating the child's credibility. The expert may testify on a sufficient foundation that the child's behavior is consistent with the behavior of other children who have allegedly been assaulted.

It is the province of the trial court to weigh against the necessity for expert testimony the

inherent dangers of such testimony.[6] A given case may present an unwarranted potential for the trier of fact to be overly impressed with the expert merely because of the expert's status, for the trier of fact to assume that the expert is vouching for the credibility of the child witness even when that is not the case, or that there is too great a danger that the jury will become distracted from its principal mission by a battle between experts. These are the familiar claims of prejudice, confusion, or waste of time that may lead the trial court, in its discretion, to conclude that the danger associated with the admission of expert testimony outweighs its probative value so that the evidence must be limited or excluded altogether pursuant to MRE 403. Where expert testimony is admitted, the trial court on request should give a limiting instruction to the effect that the testimony may be used to aid in assessing the credibility of the witnesses, but that it should not be used to determine whether sexual abuse occurred.

### III

I agree with the lead opinion's result in *Badour,* but briefly address why reversal is compelled. I would reverse because the defendant objected to the testimony on the ground that it was offered to show that the child had been abused, and the testimony revealed that the prosecutor's purpose in offering it was simply to show that the child had been abused and that the defendant had participated in it. The defendant later raised a question regarding the victim's motive in testifying that might have made the evidence helpful on the

[6] The helpfulness analysis must encompass not only the behavior of the victim, but the victim's age and the charge. As *Badour* correctly indicates, the mere fact that the complainant is under age does not authorize the admissibility of expert testimony.

issue of credibility and specifically declined a limiting instruction. The prosecution made no affirmative use of the testimony in argument. Ordinarily reversal would not be warranted in these circumstances. Here, however, in view of the halting and incomplete testimony of the victim and the fact that the expert testimony was directed not only to the question whether abuse had occurred but to the defendant's participation in it, I cannot conclude that the trial did not constitute a miscarriage of justice. MCL 769.26; MSA 28.1096.

*Beckley,* by contrast, demonstrates a near-perfect model for proper procedure in the use of such evidence. Following a pretrial hearing, the trial court held that it "would appear that the defense intends to raise the issue of whether an incest victim would have acted as the complainant did . . . ." The expert, Robin Zollar Smietanka, was to be allowed to testify whether she saw anything in the complainant which was inconsistent with the profile of an incest victim. She was specifically precluded from testifying that she thought the complainant was telling the truth or whether in fact the complainant had been an incest victim.

Robin Smietanka's testimony on direct examination that the complainant's behaviors were typical of a child who had been sexually abused was properly admissible to aid the jury in evaluating the credibility of the witnesses. In *Beckley,* the helpfulness of expert testimony in evaluating credibility became apparent in the pretrial motion and from the defendant's opening statement. The complainant's seemingly unusual behavior was revealed on direct examination of the complainant and was the subject of attack on cross-examination. Smietanka's conclusion that the complainant's behavior was consistent with sexual abuse

was properly admissible to assist the factfinder in evaluating whether the victim's behavior was indicative of falsehood. While the expert testified on redirect examination to what she called "victim symptoms" which had not been put at issue by examination of the complainant, her testimony was nevertheless relevant and proper, since it was responsive to the defendant's cross-examination. *State v Myers, supra,* pp 611-612. The jury in *Beckley* was instructed that it was not to consider the expert's testimony as bearing on whether the complainant had in fact been an incest victim. Credibility was at issue, and a proper limiting instruction was given. There was no error in Robin Smietanka's testimony.

### CONCLUSION

I concur in the express limitations on expert testimony which the lead opinion articulates: that the expert may not render an opinion that sexual abuse occurred or vouch for the credibility of the child witness. Yet the lead opinion seems uncomfortable in its conclusion, on one hand suggesting that because the expert's qualifications derive from general knowledge and not from knowledge of the case in which the expert is qualified the focus of the expert's testimony should remain general, while explicitly holding that the expert may testify regarding "familiarity or understanding of the victim's behavior at issue." *Ante,* p 727.

I would hold that where aspects of a child's behavior create credibility issues about which a qualified expert is prepared to testify, the expert's testimony is admissible if the trial court determines that it will aid the factfinder, so long as the expert does not render an opinion that sexual abuse occurred or vouch for the credibility of the

child witness. I concur in the reversal of the decision of the Court of Appeals in *People v Badour,* and in the affirmance of the Court of Appeals in *People v Beckley.*

RILEY, C.J., concurred with BOYLE, J.

ARCHER, J. (*concurring in part and dissenting in part*). I concur with the result the lead opinion reaches in *People v Badour.* I dissent, however, in *People v Beckley.*

Under the lead opinion, expert testimony on the child sexual abuse accommodation syndrome[1] is admissible to rebut the inference that the complainant's postincident behavior is inconsistent with that of a known sexual abuse victim.[2] Although the prosecution may offer the expert's testimony during its case in chief, the expert's testimony may not be used as substantive evidence to prove the fact of sexual abuse. Consequently, the expert's testimony is limited to an explanation of the complainant's specific postincident behavior traits that have been challenged as being inconsistent with those of known sexual abuse victims. In addition, the expert is precluded from stating an opinion that the complainant was sexually abused. Finally, the jury must be instructed as to the limited purpose for which the expert's testimony is offered. Because the lead opinion would permit an expert to refer to the complainant in this particular case and does not limit the expert's testimony to a discussion of the specific postincident behavior

---

[1] See *ante,* p 710 (BRICKLEY, J.).

[2] Expert testimony is, of course, not admissible to prove that the complainant in fact has been sexually abused. As the majority and concurring opinions correctly note, "syndrome" evidence is not a scientific technique that determines whether a child has been abused. Rather, it is a therapeutic tool developed to explain postincident behavior.

traits at issue without reference to the complainant or the specific facts of this case, I dissent.

In California, the very state to which this Court looks for guidance in this case, experts testifying as to syndrome evidence must confine their remarks to the class of child abuse victims in general. *People v Roscoe,* 168 Cal App 3d 1093; 215 Cal Rptr 45 (1985).[3] Although the court in *People v Bowker,* 203 Cal App 3d 385; 249 Cal Rptr 886 (1988), rejected the prosecution's argument that syndrome evidence is admissible so long as the expert does not testify that the complainant in the case before the court has been abused, even the prosecution conceded that, whenever syndrome evidence is admissible, the expert's testimony must be confined to the general class of child sexual abuse victims:

The Attorney General's argument only height-

---

[3] Credibility questions arise whenever the defendant denies the victim's story, explicitly or implicitly suggesting misrecollection or fabrication. If, in every such case, the jury could be informed that a doctor had diagnosed the complainant, based upon the specific facts in the case, as a child molest [sic] victim (or rape victim, or whatever), then the protection against misuse of psychologists' testimony erected by [*People v*] *Bledsoe* [36 Cal 3d 236; 203 Cal Rptr 450; 681 P2d 291 (1984)] would be largely dismantled.

Where the expert refers to specific events, people, and personalities and bases his opinion as to credibility on his diagnosis of this witness, then the conclusion that the witness is credible rests upon the premise that the diagnosis is accurate, and that in fact molestation had occurred. The jury in effect is being asked to believe the diagnosis, to agree that the doctor's analysis is correct and that the defendant is guilty. Such a result would subvert the sound rule adopted by a unanimous Supreme Court in *Bledsoe. It follows, therefore, that the expert testimony authorized by* Bledsoe *to permit rehabilitation of a complainant's credibility is limited to discussion of victims as a class, supported by references to literature and experience (such as an expert normally relies upon) and does not extend to discussion and diagnosis of the witness in the case at hand.* [*Roscoe, supra* at 1099-1100. Emphasis added.]

ens this tension. Relying largely on *People v Roscoe, supra,* 168 Cal App 3d 1093, he asserts the sole effect of [*People v*] *Bledsoe* [36 Cal 3d 236; 203 Cal Rptr 450; 681 P2d 291 (1984)] as applied to [child sexual abuse accommodation syndrome] evidence is to prohibit experts from testifying that the particular victim was abused. He contends the same testimony is admissible as long as the expert's remarks are confined to the class of abuse victims in general. (*Roscoe, supra,* 168 Cal App 3d 1099-1100.) In our view, however, this argument misconstrues the rationale underlying *Bledsoe* and reads *Roscoe* far too broadly. The Supreme Court cannot have intended the *Bledsoe* exception to give with one hand what had been previously taken away by the other. [*Bowker, supra* at 392-393.]

Consequently, an expert testifying on the basis of syndrome evidence is precluded from making any reference to the particular complainant or specific facts before the court.[4] See also *People v Gray,* 187 Cal App 3d 213, 215-222; 231 Cal Rptr 658 (1986); *People v Jeff,* 204 Cal App 3d 309, 329-332, 337-339; 251 Cal Rptr 135 (1988); *People v Bergschneider,* — Cal App 3d —, —; 259 Cal Rptr 219, 226-227 (1989); *People v Stark,* — Cal App 3d —,

---

[4] In *Bledsoe* our Supreme Court held that the rape trauma syndrome does not meet the *Kelly-Frye*[*] standard of admissibility as a scientifically accepted test for establishing whether a rape occurred. Therefore, such evidence is not admissible to prove guilt in a criminal trial. In *Roscoe* this court extended *Bledsoe* to child molest [sic] cases and, as defendant states, clarified the manner in which expert testimony explaining trauma behavior may be introduced. As we explained, the opinion testimony should be based upon the literature in the field and general, professional experience of the witness rather than upon an analysis and diagnosis based upon a review and evaluation of the facts in the case at hand. [*People v Jeff,* 204 Cal App 3d 309, 337; 251 Cal Rptr 135 (1988).]

---

[* *People v Kelly,* 17 Cal 3d 24; 549 P2d 1240 (1976); *Frye v United States,* 54 App DC 46; 293 F 1013 (1923).]

—; 261 Cal Rptr 479, 483-484 (1989); *People v Leon,* — Cal App 3d —, —; 263 Cal Rptr 77, 84-87 (1989).

Under the rule the lead opinion would adopt today, the danger is too great that the trier of fact will improperly infer that an expert testifying on the basis of syndrome evidence is, in effect, concluding that the particular complainant before the court has been abused. It is this very danger that the California rule, which the lead opinion purports to adopt, was intended to prevent. The child sexual abuse accommodation syndrome is a therapeutic tool. The syndrome assumes abuse, and the relevant scientific community does not rely upon syndrome evidence to prove that abuse in fact has occurred. As the Court in *Bowker* noted, the inherent danger in failing to narrowly circumscribe an expert's testimony to the general class of child abuse victims is that syndrome evidence can all too easily be misconstrued as constituting a method of proving or predicting child abuse:

> Fundamentally, *Bledsoe* must be read to reject the use of [child sexual abuse accommodation syndrome] evidence as a *predictor* of child abuse. It is one thing to say that child abuse victims often exhibit a certain characteristic or that a particular behavior is not inconsistent with a child having been molested. It is quite another to conclude that where a child meets certain criteria, we can predict with a reasonable degree of certainty that he or she has been abused. The former may be appropriate in some circumstances; the latter . . . clearly is not. [*Bowker, supra* at 393. Emphasis in original.]

The ultimate purpose of child sexual abuse accommodation syndrome evidence is to dispel the myths and misconceptions surrounding sexual as-

sault crimes. See *ante,* pp 709, 716-717 (Brick-
ley, J.). Once an expert witness presents evidence
disabusing the specific misconception at hand, such
as delayed disclosure, syndrome evidence has
served its proper function. This function can be
accomplished just as effectively without reference
to the complainant before the court. Although the
lead opinion recognizes that syndrome evidence is,
by nature, as highly prejudicial as it is probative,
see, e.g., *ante,* pp 723-725 (Brickley, J.), it wholly
fails to recognize that the marginal probative
value of the expert's testimony with reference to
the specific complainant before the court pales in
comparison to the increased and substantial de-
gree of prejudice a criminal defendant will face.

The line of questioning that took place in *Beck-
ley* demonstrates that when an expert is permitted
to refer to the particular complainant and facts of
the case, a criminal defendant faces substantial
prejudice that no curative instruction can undo.
Under these circumstances, the practical effect is
to extend the use of syndrome evidence to the
improper purpose of proving or predicting sexual
abuse, a use for which syndrome evidence no
longer proves sufficiently reliable.[5] Although the
lead and concurring opinions conclude that the
defendant himself "opened the door" to an im-
proper line of questioning when cross-examining

---

[5]  The function of rape counselors "is to help their clients deal
with the trauma they are experiencing" and "the historical
accuracy of the client's descriptions of the details of the trau-
matizing events is not vital in their tasks"; the counselors "are
taught to make a conscious effort to avoid judging the credibil-
ity of their clients." (*Id.* [*People v Bledsoe,* 36 Cal 3d], 250.)

The diagnosis, while scientifically acceptable for treatment
purposes, is not the product of a rigorous process the goal of
which is determining truth or falsity (unlike fingerprint, lie
detector, or blood tests). To admit the diagnosis to prove what
events occurred leading up to the therapeutic treatment would
be to misuse it for a purpose never intended by those in the
discipline who developed the concepts. [*Roscoe, supra* at 1097.]

the prosecution's expert witness, see, e.g., *ante*, p
731 (BRICKLEY, J.), the error requiring reversal in
this case occurred during the prosecution's direct
examination of expert witness Robin Smietanka:

*Q.* Mrs. Smietanka, do you know [the child]?
*A.* Yes, I do.
*Q.* How did you come to know [her]?
*A.* [She] was referred to me by Carol King, who
is a Protective Services' worker out of the Chil-
dren's Unit of the Muskegon County Department
of Social Services. Mrs. King called me and asked
me if I would see [the child] for the purpose of
diagnosis and treatment in regards to alleged sex-
ual abuse or incest.
*Q.* Are you aware of the fact that after the
incident that's alleged in this case that [the child]
reported only that her father had made passes at
her, referring to some inappropriate kisses, and
that that's all she initially reported in this case?
*A.* Yes, I am aware of that.
*Q.* Well, based upon your rather extensive prac-
tice and your familiarity with the literature and so
on and your knowledge of that particular behavior
and the other circumstances in which that behav-
ior manifested itself, and by that I mean [the
child], her age, her sex and so on, do you have any
opinion as to whether that kind of behavior would
be typical of a victim of such sexual abuse such as
[this child]?
*A.* That behavior would be typical of a victim of
the age and characteristics of [this child]. Many
times disclosure is delayed for an extended period
of time. Many times disclosure is made to what we
would call like a third-party source. That would be
somebody outside of the family. And many times
disclosure is not full disclosure. A child will let go
of so much information in an attempt to get a
behavior to stop or to make sure that that behav-
ior does not occur again without wanting to fully
disclose the intimate details or the extensiveness
of the behavior.

*Q.* Are you familiar with the fact that the victim in this case . . . waited a year before reporting the fact of intercourse, before reporting that it was more than passes, that there was in fact intercourse, after a delay of a year?

*A.* Yes, I am familiar with that.

*Q.* Do you have any opinion as to whether that type of behavior would be typical or normal for a victim who was sexually abused at [this child's] age?

*A.* From both my own caseload experience and from the literature, that would be a fairly common response of a child to wait . . . .

Aside from the obvious prejudice deriving from the prosecution's repeated references to the complainant as a "victim," a jury could reasonably infer that Ms. Smietanka, who testified that she had personally examined the complainant for purposes of diagnosis and treatment, was, at the very least, predicting that the complainant in fact had been sexually abused. The proper purpose of Ms. Smietanka's testimony was merely to dispel the misconceptions that the specific postincident behavior traits at issue, such as delayed disclosure and the complainant's initial tendency to deny sexual intercourse, were inconsistent with those postincident behavior traits exhibited by children who in fact had been sexually abused. The prosecution could have dispelled these misconceptions just as effectively without the repeated references to the child or the facts of this case. Under this limitation, the very real potential for unfair prejudice to the defendant would truly be kept at a minimum while permitting the people to effectively uncover the truth.

The sexual abuse of children is among the most cruel and heinous of criminal acts. The criminal preys upon the very weaknesses that children are

most unable to overcome: helplessness and inno-
cence. In cases of incest, the very person morally
responsible for protecting a child from the dangers
of life is usually the very same person who would
subject the child to the cruelest of mankind's
inhumanities in order to indulge in self-gratifica-
tion. Thus, society has the highest interest in
protecting defenseless children from incurring sub-
stantial and permanent injury at the hands of a
child abuser.

At the very same time, a fundamental value
deeply cherished by our society is the right to a
fair and impartial trial. The fairness of the proce-
dures under which a criminal prosecution is con-
ducted is zealously guarded to as high a degree as
are the justness and righteousness of the substan-
tive rule of law upon which a conviction is based.
Because the additional probative value to be
gained by permitting an expert to refer to the
complainant and particular facts before the court
is ever so slight when compared to the increased
and substantial degree of prejudice a criminal
defendant will face under the lead opinion, I dis-
sent.

Cavanagh, J., concurred with Archer, J.