*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DIONTE DESHAUN CLINGMAN,

Defendant-Appellant.

UNPUBLISHED
May 14, 2020

No. 334806
Macomb Circuit Court
LC No. 2016-000099-FC

ON REMAND

Before: BOONSTRA, P.J., and BECKERING and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of four counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a), and three counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520b(1)(a). The trial court sentenced defendant to 300 to 744 months in prison for each CSC-I conviction, and 120 to 180 months in prison for each CSC-II conviction, to be served concurrently. We previously affirmed defendant's convictions and sentences. Our Supreme Court has remanded the matter to us "for reconsideration in light of *People v Thorpe* and *People v Harbison*, 504 Mich 230[; 934 NW2d 693] (2019)."[1] We now vacate defendant's convictions and sentences, and we remand for further proceedings.

## I. BACKGROUND

As we stated previously,

Defendant was convicted of sexually abusing his cousin, who was under 13 years of age at the time of these offenses. Defendant began living in his aunt's home when he was 19 years old and the victim was 10 years old. The victim initially was

---

[1] *People v Clingman (Clingman II)*, 505 Mich 936, 936; 936 NW2d 283 (2019).

excited when defendant moved in, but she later changed her attitude and told her mother that she wished he would move out. In November 2015, when the victim was 12, she disclosed that defendant had been sexually abusing her for more than a year. The next day, her mother took the victim to the police, and also to a hospital to be examined. No physical evidence of sexual abuse was discovered during the victim's medical examination, as is often the case. The prosecution's evidence against defendant consisted primarily of the victim's accounts of multiple sexual acts committed by defendant. The defense challenged the victim's credibility and also presented an alibi defense for one of the charged incidents, which allegedly occurred on Father's Day. [*People v Clingman (Clingman I)*, unpublished per curiam opinion of the Court of Appeals, Docket No. 334806, issued July 24, 2018.]

We previously rejected, among other things, defendant's hearsay challenges to several statements by the victim introduced through the prosecution's witnesses, as well as defendant's associated assertion that he received ineffective assistance of counsel because trial counsel had not objected on hearsay grounds. We concluded that the evidence was sufficient to support defendant's convictions, and we found no error in various other procedural, evidentiary, and sentencing challenges. Nothing in our Supreme Court's order requires us to revisit any aspect of our prior analysis. We therefore reaffirm and readopt our prior opinion in full.

However, our Supreme Court permitted defendant to add a new, additional argument: that Heather Solomon, the lead forensic interviewer at the Macomb County Child Advocacy Center, also known as "the Care House," had impermissibly vouched for the victim's credibility. Defendant now argues that the admission of Solomon's alleged vouching testimony constituted plain error affecting his substantial rights, and trial counsel was ineffective for failing to object to her testimony on vouching grounds.[2] Relevant to our Supreme Court's order of remand, some additional discussion of the trial is necessary.

Solomon was qualified as an expert in forensic interviewing and protocol. She interviewed the victim alone, while being remotely monitored by other members of Care House's multidisciplinary team, on November 24, 2015. Solomon had previously been made aware of the allegations that the victim's cousin "had put his penis inside of her vagina and mouth." Solomon conducted the interview in accordance with the State of Michigan Governor's Task Force on Child Abuse and Neglect Protocol, which requires the use of open-ended, nonleading questions and an "alternative hypothesis." Solomon explained that the open-ended and nonleading questions were important "to obtain the truth and to get as much detail from the child in their own words without being leading or introducing knowledge." Using an alternative hypothesis means that, rather than "trying to prove that the allegations are true," the interviewer should explore alternative explanations for the allegations, such as a misunderstanding or coaching by someone with a grudge against the suspect or defendant.

After providing background information about how Care House conducted interviews, Solomon provided, in relevant part, the following testimony:

---

[2] As we will discuss, defendant's ineffective assistance arguments are moot.

*Q.* Okay. In this case when you interviewed [the victim], can you describe for us in general what – what her demeanor was as far as her ability to disclose to you what had happened to her?

*A.* She was very forthcoming.

* * *

*Q.* Okay. Ms. Solomon, what's been your experience with children regarding their ability to tell time or sequence of events or chronology of events?

*A.* It's always an issue that kids have trouble identifying specific dates, amount of times. It's not any different than if I were to ask you how many times did you use your debit card last – last month? It's something you just – you don't know specific times, dates, things like that.

*Q.* Okay. Do you find that that is true for a wide range of children as far as their ages –

*A.* Yes.

*Q.* – or do you find that that's more likely in younger children, older children or something else?

*A.* Well, I would say it's definitely more likely in younger children, but there's many older kids, teenagers that just can't give timeframes.

* * *

*Q.* The last question I asked was – strike that. You indicated that sometimes a range of ages of children have difficulty with sequence of events or timing, correct?

*A.* Yes.

*Q.* Okay. Did you find [the victim] to be consistent and/or age appropriate in her ability to relay timing or sequence of events?

*A.* It was very age appropriate.

* * *

*Q.* Okay. Without telling what [the victim] said during the interview, did you make any observations about how [the victim] was describing the assaults that took place?

*A.* Yes.

*Q.* And what were those observations?

*A*. She had a lot of detail that someone her age probably would not have had had something not happened.

*Q*. Okay.

*A*. Like I said, she was very forthcoming. She had information and details about who else was there, who wasn't there, things like that.

*Q*. Okay. Can you describe for me in general what [the victim's] demeanor was throughout the course of the interview?

*A*. From what I remember she – she was just very matter of fact.

*Q*. Did you find her during the interview to be emotional when she was talking about it?

*A*. I don't recall.

*Q*. Okay. When you say matter of fact, what do you mean by that?

*A*. She was able to give a lot of details and give narrative, talk about a lot of things that sometimes it's very difficult for kids her age to talk about.

*Q*. Okay. Because of the nature of what she's talking about?

*A*. Yes.

*Q*. Okay. When the interview ended, what happened next?

*A*. After the interview ended I – like I said, I typically will ask if the child has any questions and then I escort the – I escorted her back to where her family was and then I went upstairs to talk with the team.

*Q*. Okay. And based on the interview and based on the questions and answers given in the interview, were the – was the interview consistent with the allegations or consistent with the alternative hypothesis?

*A*. With – consistent with the allegations.

Defense counsel did not cross-examine Solomon. After presenting Solomon's testimony, the prosecution rested. We also note that the victim also testified personally as a witness and was vigorously cross-examined.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Initially, we recognize defendant has argued that appellate counsel was ineffective for failing to raise this issue previously, and trial counsel was ineffective for failing to raise a timely objection on the grounds of vouching. We decline to consider defendant's ineffective assistance arguments, because they are moot. "An issue is moot when an event occurs that renders it

impossible for the reviewing court to fashion a remedy to the controversy." *People v Cathey*, 261 Mich App 506, 510; 681 NW2d 661 (2004). First, pursuant to our Supreme Court's remand order, the issue of whether defendant was deprived of a fair trial on the basis of Solomon vouching for the victim's credibility is squarely before us. Irrespective of the outcome of this matter, it is therefore irrelevant whether trial counsel should have preserved the issue in some way, and it is also irrelevant whether appellate counsel should have raised the issue earlier. Secondly, as noted, we are now vacating defendant's sentences in any event. There is no further relief defendant could gain by pursuing an ineffective assistance claim against trial or appellate counsel on this basis.

## III. VOUCHING

Expert witnesses are not totally prohibited from testifying to ultimate facts at issue in criminal matters. See *People v Smith*, 425 Mich 98, 106; 387 NW2d 814 (1986). We understand the gravamen of *Thorpe* to be that an expert may not opine as to an ultimate fact or to the veracity of a complainant based solely on statements made by the complainant. *Thorpe*, 540 Mich at 255. Michigan jurisprudence had already "established that an examining physician could not opine that sexual abuse had occurred unless that opinion was supported by physical findings." *People v Del Cid*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 342402), slip op at p 6. Thus, the holding of *Thorpe* is not particularly groundbreaking, and it expressly reaffirms that experts may draw conclusions *partially* on the basis of a complainant's statements, so long as the conclusion is *also* based on physical findings within that expert's area of expertise. See *Thorpe*, 540 Mich at 255.

However, in *Thorpe*, our Supreme Court provided some further guidance as to what constituted vouching. Most central to the appeal in *Thorpe*, the expert improperly vouched for the complainant by stating that children only rarely lie about sexual abuse and offering inapplicable examples of situations in which a child might lie. *Thorpe*, 504 Mich at 259. Most central to the appeal in *Harbison*, the expert improperly vouched for the complainant by providing a diagnosis of sexual abuse based entirely on the expert's own assessment of the complainant's credibility. *Id*. at 260-262. As was the case here, in both appeals addressed in *Thorpe*, the complainants actually testified at trial. *Id*. at 238, 243. Thus, "the jury was in just as good a position to evaluate the victim's testimony as" the experts. *Smith*, 425 Mich at 109, quoted by *Thorpe*, 504 Mich at 262.

Nevertheless, in *Smith*, our Supreme Court noted an interesting caveat: the possibility that a witness was actually qualified "as an expert in assessing credibility." *Smith*, 425 Mich at 109. This is of particular significance because "there is general agreement among experts that reactions of a victim of sexual assault vary quite significantly from those of a victim of the 'average' crime." *People v Beckley*, 434 Mich 691, 715-716; 456 NW2d 391 (1990) (BRICKLEY, J.). Importantly, Solomon was not a medical doctor—she was an expert *in forensic interviewing*, with considerable experience interviewing children believed to be involved in a wide range of criminal matters. We do not believe that Solomon's opinion that the victim's ability to recall the sequence or timing of events was age-appropriate invaded the province of the jury. Even though it might have some bearing on the victim's credibility, it was an opinion within Solomon's "particular training and

experience in a special field of activity" that would not have been familiar to the jury.[3] See *People v Drossart*, 99 Mich App 66, 80; 297 NW2d 863 (1980). We do not find Solomon to have improperly vouched for the victim's credibility on that basis. Likewise, we find no improper vouching in Solomon's opinion that the victim provided an age-appropriate level of detail.

More troubling is whether Solomon vouched for the victim's credibility or truthfulness by testifying that the outcome of the interview was consistent with the allegations rather than with an alternative hypothesis. In general, expert witnesses are not precluded from also testifying as fact witnesses as to their own personal observations, and possibly even drawing factual conclusions from those observations. *LaFave v Kroger*, 5 Mich App 446, 449-450; 146 NW2d 850 (1966). Indeed, experts have always been required to provide the factual bases for any conclusions or opinions they draw. See *Hitchcock v Burgett*, 38 Mich 501, 507 (1878); *Smith*, 425 Mich at 107-108. Thus, we believe experts may provide a descriptive summary of the expert's observations. However, we find persuasive the Sixth Circuit's admonition that if an expert witness also testifies as a fact witness, that "dual role" must be made clear to the jury, as well as which role the witness was playing when it gave any particular testimony. *US v Lopez-Medina*, 461 F 3d 724, 743-745 (2006). Here, an expert *in forensic interviewing* testified that the victim's interview was "consistent with the allegations," without clearly explaining whether she was drawing an expert conclusion or merely reciting a summary of her observations. It is not clear to us that this testimony was intended to be a commentary on the victim's truthfulness, and, properly explained, it might have been proper. However, under the circumstances, we are forced to conclude that there is an unacceptable danger that the jury would have understood it as improper vouching.

Finally, we are constrained to conclude that Solomon vouched for the victim's credibility by further stating that the victim probably would not have been able to provide those details "had something not happened." To say that the victim engaged with Solomon in an age-appropriate manner conveys little, if anything, about whether the victim was actually being truthful; is clearly within Solomon's particular area of expertise; and would not be predictably within the jury's common knowledge. Stating that the victim was "forthcoming" and provided many details is, of course, simply a neutral and descriptive observation. However, we are constrained to conclude that by voicing an opinion that "something" had probably "happened," Solomon expressed an expert opinion as to the ultimate truth of the allegations solely on the basis of the victim's statements. Thus, under *Thorpe*, we must find that Solomon impermissibly vouched for the victim's credibility.

## IV. PREJUDICE

Our Supreme Court's opinion in *Thorpe* leaves no room for any doubt that in a case turning entirely on a credibility contest, e.g., in a case lacking in any additional evidence other than the victim's own statements, improper vouching by an expert is *per se* plain error affecting the defendant's substantial rights. *Thorpe*, 504 Mich at 263-266. Although there was some independent evidence to corroborate the victim's version of events, there was also some independent evidence tending to dispute the victim's version of events, so as we noted in our

---

[3] Everyday experience amply shows that the average adult is poorly equipped to comprehend the perspective of a child, and vice versa.

previous opinion, this case mostly turned on whether the jury chose to believe the victim. We reiterate that we find no improper vouching from Solomon's neutral description of the victim's demeanor during the interview or in Solomon's expert opinion that the victim's recollections and statements were appropriate for her age. However, we are constrained by *Thorpe* to conclude that it was plain error that affected defendant's substantial rights for Solomon to express a belief as to the likely truth of the victim's statements.

## V. CONCLUSION

As stated above, we reaffirm and readopt our prior opinion in full, and we now supplement that opinion with further analysis as ordered by our Supreme Court. We therefore must vacate defendant's convictions and sentences, and we remand to the trial court for a new trial or for other proceedings as it and the parties deem necessary and appropriate consistent with our opinions. We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Amy Ronayne Krause

-7-