*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ELDRED LEE BROOKS, also known as ELDRED
LEE BROOKS III,

        Defendant-Appellant.

UNPUBLISHED
January 28, 2021

No. 349955
Muskegon Circuit Court
LC No. 18-003925-FH

Before: SHAPIRO, P.J., and SAWYER and BECKERING, JJ.

PER CURIAM.

Defendant, Eldred Lee Brooks, appeals as of right his jury trial convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(2)(b) (sexual penetration of a person less than 13 years of age by a person 17 years of age or older), and second-degree criminal sexual conduct (CSC-II), MCL 750.520c(2)(b) (sexual contact with a person less than 13 years of age by a person 17 years of age or older). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 31 to 55 years' imprisonment for the CSC-I conviction and 15 to 35 years' imprisonment for the CSC-II conviction. On appeal, defendant contends the trial court erred by allowing several expert witnesses to provide prejudicial testimony that vouched for the credibility of the complainant, JF. For the reasons set forth below, we agree. Accordingly, we reverse defendant's convictions and remand for a new trial.

## I. RELEVANT FACTS

This case arises out of allegations that defendant sexually abused JF, a cousin of defendant's girlfriend at the time, Latoya. JF testified that the first incident occurred in summer or fall 2017 when she was nine years old. She was at Latoya's apartment watching a movie in a bedroom with defendant when defendant vaginally penetrated her with his tongue and penis. The second incident occurred at Latoya's home in February 2018. JF was lying on a couch in the living room when defendant again vaginally penetrated her with his penis. The next day, JF revealed the sexual abuse to her godmother, who informed JF's mother. JF's mother called a meeting with JF,

Latoya, and defendant. During the meeting, both JF and defendant denied that defendant had sexually abused JF. Afterwards, JF informed her mother that defendant did in fact abuse her.

In March 2018, JF's mother took her to Hackley Hospital, where she was examined by a sexual assault nurse examiner (SANE), who reported that the "examination showed that everything was normal and there were no abnormal findings." At the hospital, a Muskegon Police Department officer interviewed both JF and her mother. Muskegon Police Detective Logan Anderson then started an investigation into JF's allegations. In April 2018, Dianne Adams, director at the time of the Children's Advocacy Center,[1] conducted a forensic interview of JF, subsequent to which she referred JF for counseling and a medical examination. The medical examination was performed at the Children's Advocacy Center by the center's medical director, Dr. Yvonne Mallon, M.D., a general pediatrician specializing in child abuse pediatrics. In June 2018, Detective Anderson interviewed defendant regarding JF's allegations, and defendant denied that he had ever sexually abused JF. Detective Anderson and defendant scheduled a second interview, but defendant failed to attend. Over the next several months, Detective Anderson repeatedly tried to schedule another interview with defendant, but defendant either canceled before the interview or failed to attend.

In July 2018, Detective Anderson learned that one of Latoya's biological children, LD, accused defendant of touching her inappropriately on four separate incidents. One incident involved defendant sitting in a children's pool wearing boxer shorts with LD sitting on his lap, facing him, while defendant rubbed her thighs. Latoya's neighbors, Eddie Bradford and Lynn Easter, witnessed the incident through a window and were sufficiently alarmed to record it using a cell phone. Detective Anderson subsequently secured an arrest warrant for defendant. Defendant was arrested near a bus station, with a one-way bus ticket to Louisiana in his possession.

Defendant was initially charged with one count of CSC-I as a fourth-offense habitual offender and tried before a jury. After defendant's first trial ended in a mistrial, the prosecution amended the charge to one count of CSC-I and one count of CSC-II, with a fourth-offense habitual offender enhancement, and proceeded with a second trial. At defendant's second trial, the prosecution presented testimony from JF, LD, Bradford, Easter, and Detective Anderson. JF provided direct evidence of the charged crimes; LD, Bradford, and Easter testified to other-acts evidence pursuant to MCL 768.27a(1); and Detective Anderson's testimony suggested that defendant was attempting to flee, thus showing consciousness of guilt. In addition, the prosecution presented expert witness testimony from Adams, Dr. Mallon, and Thomas Cottrell, LMSW, chief programming officer of the YMCA West Central Michigan. Defendant was the only witness for the defense; he denied all of the allegations against him. The jury found defendant guilty as charged and the trial court sentenced him as indicated above. This appeal followed.

---

[1] When Adams interviewed JF, she was employed by the Child Abuse Council in Muskegon, where she served as director of the Children's Advocacy Center, which is a part of the Child Abuse Council. Adams no longer worked there at the time of defendant's second trial. Defendant's first trial resulted in a mistrial.

## II. DISCUSSION

Defendant contends that the trial court erred by allowing expert witnesses to provide testimony that improperly vouched for the credibility of JF. Because this case was tried in a way that now reads much like a "what not to do" playlist from the Supreme Court's subsequent ruling in *People v Thorpe*, 504 Mich 230; 934 NW2d 693 (2019), we agree.[2]

This Court reviews unpreserved[3] claims of error for plain error "affecting a defendant's substantial rights." *People v Jackson*, 292 Mich App 583, 592; 808 NW2d 541 (2011). To prevail under plain-error review, a defendant must establish that an error occurred, that it was plain or obvious, and that it affected his substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). An error affects a defendant's substantial rights if it "affected the outcome of the proceedings." *Id*. Even if a defendant establishes these requirements, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings . . . ." *Id*. at 763-764 (quotation marks and citation omitted; second alteration in original).

### B. EXPERT TESTIMONY

"The trial court has an obligation under MRE 702 to ensure that any expert testimony admitted at trial is reliable." *People v Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007) (quotation marks and citation omitted). When admitting expert testimony, trial courts must determine whether "the testimony (1) will assist the trier of fact to understand a fact in issue, (2) is provided by an expert qualified in the relevant field of knowledge, and (3) is based on reliable data, principles, and methodologies that are applied reliably to the facts of the case." *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012); see also MCR 702. In addition, the Michigan Supreme Court has specifically addressed the limitations on the testimony of expert witnesses in cases involving allegations of child sexual abuse. In *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857 (1995), amended 450 Mich 121 (1995), our Supreme Court reaffirmed its plurality holding in *People v Beckley*, 434 Mich 691; 456 NW2d 391(1990), which limited the testimony of expert witnesses as follows: "(1) an expert may not testify that the sexual abuse occurred, (2)

---

[2] The Supreme Court issued *Thorpe* one day after defendant was sentenced, but *Thorpe* also reiterates prior relevant precedent.

[3] We disagree with defendant's assertion that this issue is preserved with respect to the testimony of each expert witness. Defense counsel did not object to Cottrell's testimony on the ground that it improperly vouched for JF's credibility, but on the ground of relevance. "An objection based on one ground is usually considered insufficient to preserve an appellate attack based on a different ground." *People v Kimble*, 470 Mich 305, 309; 684 NW2d 669 (2004). Defense counsel did not object to admission of Dr. Mallon's testimony regarding a 1994 study upon which she relied, but questioned her about the study on cross-examination and, on redirect examination, objected to her testimony only because he believed she was mischaracterizing the study. Finally, defense counsel made no objections to Adams's testimony on the ground that it constituted impermissible vouching. See *id*.

an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty." The *Beckley* Court explained its rationale for these limitations:

> The use of expert testimony in the prosecution of criminal sexual conduct cases is not an ordinary situation. Given the nature of the offense and the terrible consequences of a miscalculation—the consequences when an individual, on many occasions a family member, is falsely accused of one of society's most heinous offenses, or, conversely, when one who commits such a crime would go unpunished and a possible reoccurrence of the act would go unprevented—appropriate safeguards are necessary. To a jury recognizing the awesome dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat. [*Beckley*, 434 Mich at 721-722; quoted in *Peterson*, 450 Mich at 374.]

Further, the *Peterson* Court held that an expert witness in child sexual abuse cases may testify as follows:

> (1) an expert may testify in the prosecution's case in chief regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim, and (2) an expert may testify with regard to the consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim's credibility. [*Id*. at 352-353.]

With these principles in mind, we turn to our analysis of the challenged testimony.

## 1. THOMAS COTTRELL

The first expert witness to testify at defendant's second trial was Cottrell, whom the trial court qualified without objection as an expert in child sexual abuse dynamics, particularly in abuse disclosure and offender behavior. On direct examination, Cottrell discussed several misconceptions people tended to have regarding children who are victims of sexual abuse and of the perpetrators of such abuse. He explained, for example, how and to whom victims disclose sexual abuse, why victims may delay reporting sexual abuse, the relationship between victims and offenders, and behaviors of sex offenders.

Cottrell's testimony regarding common misconceptions of sexual abuse, the victims of child sexual abuse, and the relationship between victims and sexual offenders was proper. See *Peterson*, 450 Mich at 379-380. The *Peterson* Court specifically held that, when "there are common misperceptions regarding the behavior of the victim on which a jury may draw an incorrect inference, such as the delayed reporting, the prosecutor may present limited expert testimony dealing solely with the misperception." *Id*. at 379. In this case, Cottrell's testimony regarding delayed reporting was utilized for the proper purpose of explaining such things as why the victim did not report the abuse after the first incident and why she denied being sexually abused in the park while defendant was present. Without Cottrell's testimony, those facts might have led the jury to draw "an incorrect inference" about the victim's behavior. See *id*.

However, Cottrell also provided testimony that essentially vouched for JF's credibility. In response to the prosecutor asking whether Cottrell had experience with children falsely alleging sexual abuse to attract attention, Cottrell stated that he had not seen any such cases. He contended that the cost of fabricating a sexual abuse allegation was high for a child, and that children were unable to maintain false allegations of sexual abuse long term because they did not have "that level of sophistication." On redirect, Cottrell stated that out of the "thousands and thousands of children" that the YWCA had treated, the YWCA had concluded that only a handful of them were lying. He also confirmed on redirect that children reported falsely approximately 2% of the time,[4] and that such false reports typically involved coaching or custody cases.

Cottrell's testimony that children lacked the sophistication to sustain false allegations of sexual abuse long term vouched for JF's credibility by strongly inferring that, since JF continued to maintain her allegations of sexual abuse against defendant more than two years after the alleged abuse occurred, her accusations must be true. In addition, Cottrell's testimony that instances in which children falsely alleged sexual abuse typically involved coaching or custody battles, neither of which applied here, suggested that there was 0% chance that JF was falsely accusing defendant of sexual abuse. See *Thorpe*, 504 Mich at 259.[5] Further, Cottrell's testimony about the high cost of fabricating allegations of sex abuse and that, in his experience, only a handful of the "thousands and thousands of children" treated at the YMCA falsely reported sexual abuse also served indirectly to vouch for the credibility of JF.

Defendant's case was a credibility contest. There was no physical evidence, there were no other witnesses of the alleged assaults besides JF, and defendant made no inculpatory statements. As already indicated, the prosecution's case consisted of JF's allegations, other-acts evidence provided by the testimony of LD, Bradford, and Easter, evidence that defendant may have been fleeing provided by Detective Anderson, and the testimony of the three expert witnesses. Defendant testified in his own defense and denied the allegations. Although Cottrell did not directly state that JF was credible and truthful in any of the statements he made at trial, in credibility contests such as this one, the jury "is looking to hang its hat on the testimony of witnesses it views as impartial." *Peterson*, 450 Mich at 374 (quotation marks and citation omitted). We conclude that defendant has established error with regard to testimony of Cottrell that vouched for JF's credibility. The error was plain, given that the Michigan Supreme Court has repeatedly held that testimony similar to what Cottrell provided in this case was improper. See *Thorpe*, 504 Mich at 259-260. And while the other-acts evidence and defendant's apparent plan to flee— indicating possible consciousness of guilt—makes this case stronger, because there were no other witnesses or physical evidence with respect to the specific incidents in question, rendering this a

---

[4] Defendant challenged Cottrell's statement that 2% of children lie about sexual abuse. However, defense counsel elicited this testimony by asking Cottrell, "What percentage of child reporters falsely report?" Therefore, defendant's challenge to that statement was waived. See *People v Riley*, 465 Mich 442, 448-450; 636 NW2d 514 (2001) (finding no error where counsel called a witness to give the specific testimony he objected to on appeal).

[5] We note that Cottrell's testimony along these same lines was the subject of review in *Thorpe* as well. *Id*. at 259.

pure credibility contest, we conclude that the error likely affected the jury's ultimate decision. See *id*. at 260.

## 2. DR. YVONNE MALLON

Defendant takes issue with Dr. Mallon's testimony due to her conclusion that JF suffered "suspected pediatric sexual abuse" despite no physical corroborating evidence.

MRE 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." However, the Michigan Supreme Court has repeatedly held that "an examining physician cannot give an opinion on whether a complainant had been sexually assaulted if the conclusion [is] nothing more than the doctor's opinion that the victim had told the truth." *Thorpe*, 504 Mich at 255 (quotation marks and citation omitted; alteration in original). When an examining physician's testimony is based "solely on what the victim had told him," absent evidence qualifying her as an expert in assessing credibility the physician's testimony is objectionable because it lacks a "reliable foundation," since jurors are just as qualified to evaluate the victim's credibility. *People v Smith*, 425 Mich 98, 109; 387 NW2d 814 (1986). However, "an examining physician, if qualified by experience and training relative to treatment of sexual assault complainants, can opine with respect to whether a complainant had been sexually assaulted when the opinion is based on physical findings *and* the complainant's medical history." *Thorpe*, 504 Mich at 255.

Dr. Mallon testified on direct examination that when children were referred to the Children's Advocacy Center, they underwent a forensic interview, and if the forensic interviewer determined that the child needed a physical examination, she would examine the child. She testified that the majority of examinations she performed on children who alleged sexual abuse produced normal results, which meant that the examinations revealed no injuries. She frequently used the phrase "it's normal to be normal," which meant that even if a child alleged vaginal penetration, the results of a physical examination were usually normal. She explained that the phrase is based primarily on a 1994 study that analyzed 236 children who alleged sexual abuse and concluded that the physical examinations of 77% of the children were normal.[6] Dr. Mallon confirmed that, after taking JF's medical history, she performed "a head to toe" examination of JF, including a vaginal and anal examination, and found no injuries. Dr. Mallon reiterated that out of

---

[6] Although the name of the study was not provided in the lower court record, it appears that Dr. Mallon was relying on *Examination Findings in Legally Confirmed Child Sexual Abuse: It's Normal to be Normal*, 94 Pediatrics 310 (1994). See *Thorpe*, 504 Mich at 265 n 65; *People v Del Cid*, ___ Mich App __, ___; __ NW2d __ (2020) (Docket No. 342402); slip op at 3-5, 8-10. However, the Michigan Supreme Court and this Court have both held that reliance on that study to diagnose a child with "pediatric sexual abuse" is "seriously misplaced" and improper because the authors of that article "did not intend for pediatricians to rely on the article to make a diagnosis of 'probable pediatric sexual abuse' at trial." *Thorpe*, 504 Mich at 265, 265 n 65; *People v Del Cid*, ___ Mich App at __, __; __ NW2d __, slip op at 8-10 (Docket No. 342402, issued February 27, 2020).

the hundreds of examinations that she had performed, she had seen "[v]ery few" with physical evidence of injuries.

On cross-examination, Dr. Mallon confirmed that the physical examination alone did not prove or disprove that JF was sexually abused, but that, based on JF's medical history and the fact that she found what she expected to find when she examined JF, she had, in fact, reached a conclusion. Pressed by defense counsel on re-cross to concede that she could not confirm whether or not JF had been sexually abused, given that the results of JF's examination were normal, Dr. Mallon pushed back, insisting "I did confirm it. . . . I confirmed suspected, suspected pediatric sexual abuse based on [her] history and physical exam."

Defendant has established plain error affecting his substantial rights with regard to Dr. Mallon's testimony. Her testimony that JF suffered from "suspected pediatric sexual abuse" "clearly falls within *Smith's* holding that an examining physician cannot give an opinion on whether a complainant had been sexually assaulted if the 'conclusion [is] nothing more than the doctor's opinion that the victim had told the truth.' " *Thorpe*, 504 Mich at 262, quoting *Smith*, 425 Mich at 109. Dr. Mallon's opinion is objectionable, and constitutes improper vouching, because it is based solely on what JF told her. "Such testimony is not permissible because a 'jury [is] in just as good a position to evaluate the victim's testimony as' the doctor." *Id*., quoting *Smith*, 425 Mich at 109. After our Supreme Court vacated part of our judgment and remanded the case to us for reconsideration in light of *People v Harbison*, the companion case in *Thorpe*, this Court held in *People v Del Cid* that "an examining physician's testimony diagnosing a child-complainant with 'possible sexual abuse' is inadmissible without corroborating physical evidence . . ." and that testimony to that effect was plainly erroneous and called for reversal because we could not say it was harmless. *People v Del Cid*, __ Mich App __, ___; __ NW2d __; slip op at 6 (Docket No. 342402, issued February 27, 2020. As we explained in *Del Cid*:

> [W]here there are no physical findings a physician may not testify that the complainant suffered "possible pediatric sexual abuse" or other phrases indicating a conclusion as to the likelihood that such abuse actually occurred. At the same time, however, a medical expert may offer the opinion that a lack of physical findings does not affirmatively establish that no abuse occurred [*Id*. at slip op 9 n 6.]

Here, Dr. Mallon's testimony that she confirmed that JF suffered "suspected pediatric child abuse" falls under this prohibition. Although Dr. Mallon testified that she confirmed "suspected pediatric sexual abuse" instead of "probable" or "possible" pediatric sexual abuse, "suspected pediatric sexual abuse" is not significantly different from "possible pediatric sexual abuse" or "probable pediatric sexual abuse" "in terms of the physician's endorsement of the accusation." *Del Cid*, ___ Mich App at ___; slip op at 9. In each instance, "the examining physician speaks to the likelihood of abuse in the absence of any physical evidence and couches it in terms of a medical diagnosis," which "necessarily leads the jury to believe that the expert witness finds the complainant's account credible." *Id*. Even a slight or subtle credibility endorsement by an expert can provide the hook that sways a jury. The error in admitting Dr. Mallon's opinion testimony was plain, or obvious, *Thorpe*, 504 Mich at 262, and likely "affected defendant's substantial rights" because Dr. Mallon "clearly vouched" for the credibility of JF, *id*. at 263.

### 3. DIANNE ADAMS

The last expert witness to testify for the prosecution was Adams, whom the trial court qualified as an expert in forensic interviews and child sexual abuse dynamics. Defendant contends that Adams's testimony that she interviewed JF using protocols that were "truth seeking" and designed to obtain the most reliable responses from the interviewee, coupled with her testimony that she referred JF for counseling and a medical examination after her interview, clearly vouched for the credibility of JF's accusations of sexual abuse.

Adams testified at some length to the methods and goals of forensic interviewing. She stated that the goal of forensic interviewers is "to facilitate an interview for a child that is developmentally appropriate, unbiased, and truth seeking" and "to give the child an opportunity to tell their story in a free narrative format as much as possible." Adams explained, among other things, the setting for a forensic interview, the participants, the types of questions asked, and the demeanor and responses of the interviewer. Adams testified that one of the goals of forensic interviewing was "hypothesis testing." Hypothesis testing refers to considering alternative theories for the alleged behavior and being attuned during the interview to information that might suggest that one of the alternatives explains the complained-of conduct. Adams explained:

> [I]f we have an allegation—the child's allegation is the babysitter touched my butt. Before the interview we'll come up with some other hypothesis. And one might be, could that have possibly happened during the routine caregiving, when the babysitter was helping say to potty train or changing a diaper or just helping a child clean themselves.

Adams referred to these hypotheses as "red flags," evidence of which the interviewers look for during an interview. Adams said that, depending on what a child disclosed during the interview, she may refer the child for a medical examination, or counseling, or both. She stated that she "definitely" referred a child to counseling if the child disclosed sexual abuse during the interview. Adams testified that she conducted a forensic interview with JF, that JF spoke freely during the interview, and that, as a result of the interview, she referred JF for counseling and a medical examination. Adams testified similarly as to LD.

Defendant has established plain error affecting his substantial rights with regard to the testimony of Adams. The statements Adams made regarding how JF spoke to her were proper because she was simply describing her own personal observations for the jury. Additionally, Adams was permitted to discuss the general goals of forensic interviewing. However, Adams also testified that forensic interviews were "truth-seeking" interviews that were designed to weed out children who were not telling the truth about the alleged abuse. She stated that depending on what was disclosed during the interview, she would refer children for counseling and a medical examination, and that she "definitely" referred children to counseling who disclosed sexual abuse.

She then stated that she referred JF for medical treatment and counseling on the basis of her statements during the interview. This testimony strongly implied that she found JF credible.[7]

The prosecution contends that Adams's testimony that she referred JF and LD for counseling and medical examinations does not imply that she believed their allegations, just that they disclosed sexual abuse during their forensic interviews. We agree with the prosecution that there is a difference between making disclosures and finding those disclosures credible. However, Adams's testimony about the truth-seeking goal of forensic interviewing, the techniques and settings employed to achieve that goal, and the preparations undertaken by the interviewers to identify and probe the possibility of alternative explanations for allegations of abuse give rise to the reasonable inference that an interviewer who refers an interviewee for further services did so because he or she found no alternative explanations for the interviewee's allegations and found the interviewee's disclosures to some extent credible. Thus, we conclude that defendant established that the trial court erred in permitting Adams to provide testimony that vouched for the credibility of JF and LD, that the error was plain, see *Thorpe*, 504 Mich at 259-269, and that it likely "affected defendant's substantial rights," *id*. at 263.

Having concluded that defendant established plain error affecting his substantial rights with regard to testimony offered by Cottrell, Dr. Mallon, and Adams, the next question is whether reversal is required. See *Carines*, 460 Mich at 763-764. We believe it is. As already mentioned, we recently held that, without corroborating physical evidence, an examining physician's opinion that the child-complainant suffered "possible sexual abuse" was plainly erroneous and called for reversal because it seriously affected the integrity of the defendant's trial. *Del Cid*, op at 11. Dr. Mallon's testimony confirming that JF suffered "suspected pediatric child abuse" falls under this prohibition. In *Thorpe*, 504 Mich at 235, our Supreme Court held "that expert witnesses may not testify that children overwhelmingly do not lie when reporting sexual abuse because such testimony improperly vouches for the complainant's veracity." Cottrell's testimony falls under this prohibition. Finally, while Adams did not testify directly to JF's credibility, the thrust of her testimony strong implied that JF's spoke freely and truthfully during her interview and that her disclosures of alleged sexual abuse were credible. In a credibility contest such as this one, Adams's testimony helped provide a hook on which the jury could "hang its hat" when it came to assessing the credibility of JF and of defendant. Because there was error in the testimony of all three prosecution experts, we conclude that these errors seriously affected the integrity of defendant's trial. Thus, we reverse defendant's convictions and remand for a new trial.

Reversed and remanded. We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ David H. Sawyer
/s/ Jane M. Beckering

---

[7] Adams also vouched for the veracity of LD's allegations when she testified that she referred LD for a medical examination after forensically interviewing her. Adams's testimony implied that she found LD's allegations credible because she referred her for further help.